405 A.2d 10.

STATE *vs.* ROBERT A. ANGELL.

AUGUST 9, 1979.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger, JJ.

BEVILACQUA, C.J.    The defendant, Robert A. Angell, was indicted for murder and tried before a jury in the Superior Court. The jury returned a verdict of guilty, and the judge sentenced the defendant to life imprisonment. The defendant appeals from that judgment.

The testimony developed at the trial established that Antonio Bettencourt and defendant were at the Watchemoket Bar in East Providence on the evening of September 19, 1973. A bartender at that bar, John Medeiros, testified that the two men drank from approximately 6:30 p.m. until 8 p.m. and that Bettencourt was buying "rounds" of drinks for himself and defendant.

Medeiros also testified that Bettencourt had a wallet full of money. Under further questioning, Medeiros stated on cross-examination that someone had told him that Bettencourt had cashed a check that evening. He later testified on redirect examination, over defendant's objection, that he was told that the amount of the check was approximately $230.

The defendant and Bettencourt left the Watchemoket Bar near 8 p.m. and went to the East Providence Athletic Club. James Carroll, a bartender at that club, testified that the two men came in together and drank and played pool. He further testified that defendant left the club at approximately 8:30 p.m. after he stated that he was going home to get his car to give Bettencourt a ride home. Carroll also stated that Bettencourt left the club a few minutes after defendant.

Carroll further explained that approximately 20 minutes later, defendant, whom he described as being "out of breath," came back into the bar to look for Bettencourt but left when Carroll told him that Bettencourt was gone.

Carroll also testified that from his position behind the bar he could normally see and hear cars that entered and left the club parking lot. He stated that upon defendant's return to the bar, he neither heard nor saw any car enter or leave the parking lot.

Testimony was also elicited from Joseph Coelho and William McNally, who were in the vicinity of the club that evening. McNally testified that he saw Bettencourt walk into the club that evening with another man. He stated that sometime later he saw Bettencourt walking away from the club followed up the street by the same individual with whom he had entered the club. Coelho also stated that he saw Bettencourt walk along the street away from the club that evening and that a man who fit the description of defendant followed Bettencourt up the street.

Testimony was also given by Edward Stanley, an East Providence resident. Mr. Stanley testified that during the evening of September 19, 1973, he was in his home on Fifth Street when he heard someone moaning outside. He stated that when he went outside, he found Bettencourt lying face down along the side of the curb, whereupon he proceeded to call the police.

The medical examiner, Augustine Colella, testified that Bettencourt had a laceration between the back and top of his head and that he had suffered a hemorrhage within the subdural space of his head. He stated that the causes of death were severe head injuries, including the subdural hemorrhage, and the hemorrhage was consistent with blunt trauma.

Sergeant John Hardy of the East Providence Police Department, an investigating officer, testified that the following day he and another officer went to the area where Bettencourt was found to look for evidence relating to the incident. He stated that they found a 2- by 4-inch board approximately 10 inches long about 6 to 10 feet from the area in which Bettencourt was found. According to Sergeant Hardy, the board was tagged for identification and turned

over to the East Providence Bureau of Criminal Identification. The board was not presented as evidence at the trial, however, because it was destroyed by a fire in the East Providence Police Station.

The defendant's wife, Evelyn Angell, also testified at the trial. Mrs. Angell, who failed to give the police a statement concerning her husband's alleged culpability in Bettencourt's death until 3 years after the incident, testified that on the evening in question defendant left their apartment about 5:15 p.m. to go to the Watchmoket Bar. She stated that he returned that evening between 8 p.m. and 9 p.m. out of breath with blood on his T-shirt. According to Mrs. Angell, defendant stated that he had hit Bettencourt with a board and that he thought that he had killed him. She further testified that defendant told her that he had taken money from Bettencourt and that he had showed her between $100-$175. She also stated that her husband replaced his torn T-shirt with a burnt-orange one. She then disposed of the old T-shirt by putting it in the garbage. According to Mrs. Angell, she and defendant rehearsed an alibi at his insistence. The alibi concerned a visit to her mother's house and was to be used if the police questioned Mrs. Angell. During cross-examination, Mrs. Angell indicated that the police had told her that when Bettencourt was found, money was missing from his person.

The defendant also took the witness stand to testify on his own behalf. He stated that he was at the Watchemoket Bar with approximately $10-$20 when he began drinking with Bettencourt. Pursuant to Bettencourt's invitation, he went to the East Providence Athletic Club, where the two continued to drink. He stated that he left the club alone and that he went home to get his car to give Bettencourt a ride home. According to Angell, he returned to the club with his car but was told that Bettencourt had already left. He stated that he then returned home and took his wife to visit with his mother-in-law. The defendant denied that he struck and robbed Bettencourt.

Alfred Nesbit, Mrs. Angell's brother, testified as a rebuttal witness. Mr. Nesbit stated that he was living with his mother on Northup Street in Warwick on September 19, 1973, and that defendant had not been there to visit that evening. He further testified that defendant had not been to the Northup Street residence to visit since November 1972.

The defendant alleges three errors on appeal, which we will consider individually.

I

The defendant contends that the trial justice erred in his denial of his motion for a judgment of acquittal because the state failed to establish the corpus delicti of the crime of murder. The defendant argues that a death, standing alone, does not establish criminal homicide and that there must be some evidence independent of a confession or an admission on the part of a defendant. The defendant thus asserts that because the record is completely devoid of evidence to support a finding of criminal homicide, the motion for a judgment of acquittal should have been granted.

We do not dispute the principle that the corpus delicti of a crime must be established before extrajudicial confessions or admissions connecting the accused with the crime are admissible into evidence. *State* v. *Wilbur*, 115 R.I. 7, 13, 339 A.2d 730, 734 (1975). As a result, there must be proof of the crime from some source other than defendant's admission. *Hall* v. *Superior Court*, 120 Cal. 2d 844, 847, 262 P.2d 351, 352 (1953); *People* v. *Cullen*, 37 Cal. 2d 614, 624, 234 P.2d 1, 7 (1951). The prosecution is thus required to establish the corpus delicti through the production of sufficient direct or circumstantial evidence to establish that the crime charged was committed, regardless of who may have committed it. *State* v. *Boswell*, 73 R.I. 358, 362-63, 56 A.2d 196, 198 (1947). We are of the opinion that only prima facie proof of corpus delicti must be established prior to the introduction of defendant's admissions or confessions. *People* v. *Bolinski*, 260 Cal. 2d 705, 709, 67 Cal. Rptr. 347, 350 (1968).

An examination of the record in the instant case, excluding the alleged admissions made by defendant to his wife, reveals evidence that indicated that defendant and Bettencourt were together at two bars the night Bettencourt sustained his injuries. The testimony also indicated that Bettencourt, who had cashed a check that evening, had a substantial amount of money and that he was buying drinks for himself and defendant. Additional testimony also indicated that defendant followed Bettencourt up the street away from the East Providence Athletic Club shortly before Bettencourt was found injured in the street.

The medical testimony introduced indicated that Bettencourt suffered an injury to the back of his head and that the injury was consistent with a blunt trauma. Doctor Colella testified that the injury could have been caused by, *inter alia*, the striking of the head by an instrument such as a billy club or baseball bat. A 2- by 4-inch board approximately 10 inches long was found near the area Bettencourt was injured. Furthermore, there was the testimony of Mr. Stanley, who found Bettencourt lying face down on the street with the injury to the back of his head.

The defendant's wife testified that on the night in question, defendant returned home between 8 p.m. and 9 p.m., perspiring and out of breath with blood on his T-shirt. The defendant's wife also stated that her husband changed his shirt and gave it to her to destroy. Furthermore, defendant's wife testified that defendant counted approximately $100-$175 in her presence. This testimony was consistent with other testimony that money was missing from Bettencourt when he was found.

We are of the opinion that the evidence introduced in the present case, absent the alleged admissions made by defendant to his wife, would at the very least warrant the reasonable conclusion that Bettencourt's death was caused by criminal activity. We therefore find that the prosecution established the corpus delicti prior to the introduction of defendant's alleged admissions.

## II

The defendant argues that the trial justice committed error in admitting into evidence, over his timely hearsay objection, testimony that concerned the amount of the check allegedly cashed by Bettencourt.

A witness for the prosecution, John Medeiros, testified during direct examination that Bettencourt's wallet was "full of money" and "[there] was quite a bit there." Under cross-examination the witness was asked if he recalled whether Bettencourt had cashed a check at the bar that evening. In response, the witness answered, "I was told he did, not by me he didn't." On redirect examination Medeiros was asked if he was told the amount of the check cashed by Bettencourt. Over defendant's objection, Medeiros said he was told the check was for approximately $230.

The defendant contends that the trial justice committed reversible error in permitting Medeiros to testify that someone told him that the check cashed was in the amount of $230. The trial justice, reasoning that defendant had initiated the inquiry concerning the check during cross-examination, overruled defendant's objection. On appeal, the state counters defendant's allegation by arguing that the trial justice did not err in his ruling. The state also argues alternatively that the testimony did not prejudice defendant because it was merely cumulative evidence.

Although we agree with defendant that the testimony concerning the amount of the check was objectionable hearsay, we conclude that the testimony was not prejudicial error requiring reversal of his conviction.

Hearsay evidence is a statement, other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted. *Manuel J. Furtado, Inc.* v. *Sarkas,* 118 R.I. 218, 224, 373 A.2d 169, 172 (1977); *Allen V. D'Ercole Construction Co.,* 104 R.I. 362, 369, 244 A.2d 864, 869 (1968); Moore, *Federal Practice,* Rule 801(c) (2d ed. 1976). The reasons most often cited for the need to exclude hearsay is the want of the normal safeguards

of oath, confrontation and cross-examination for the credibility of the out-of-court declarant. *McCormick Evidence* §246 at 584 (2d ed. 1972).

Although Medeiros's testimony concerning the amount of the check was clearly hearsay and should have been excluded, we have held that the admission of hearsay evidence is not prejudicial when the evidence is merely cumulative and when defendant's guilt is sufficiently established by proper evidence. *State* v. *Camerlin*, 117 R.I. 61, 64-65, 362 A.2d 759, 761 (1976). In the instant case, the hearsay testimony clearly related to the amount of money Bettencourt had the evening he suffered his injury. We are of the opinion that there was ample evidence, other than hearsay testimony, that indicated that Bettencourt had a large sum of money that evening. Medeiros testified that Bettencourt had cashed a check that evening and that he had a large sum of money in his wallet. The record also contains the testimony of defendant's wife, who testified that defendant admitted to her that he hit Bettencourt with a board and took a roll of money from him. Mrs. Angell also testified that defendant showed her between $100-$175 that evening.

We are of the opinion that the admission of the testimony regarding the amount of the check cashed by Bettencourt was purely cumulative in light of the other evidence that was presented to the jury. *Id.* We therefore conclude that the admission was harmless error.

### III

During the trial, defendant sought to prevent his wife from testifying when he argued that at common law, communications made in confidence from one spouse to another are privileged and cannot be disclosed without the permission of the declarant-spouse. On appeal, defendant contends that the common-law confidential-communication privilege has not been abrogated by statute, and therefore it was reversible error on the part of the trial justice to allow Mrs. Angell to testify concerning defendant's alleged admissions.

In *State* v. *Kenyon*, 18 R.I. 217, 26 A. 199 (1893), this court addressed the issue of privileged communications as well as the common-law principle that made a husband and wife incompetent as witnesses for or against each other in criminal cases. We stated in *Kenyon* that the Legislature specifically abrogated the disability of either spouse to testify for or against the other in a criminal case. In making this determination, we initially looked to the legislative enactment entitled "Pub. Stat. R.I. cap. 214, §36," whereby a husband or wife of either party in a civil action was made competent to testify as a witness. That enactment contained the following specific provision:

> " 'Provided, that neither shall be permitted to give any testimony tending to criminate the other or *to disclose any communication made to him or her, by the other, during their marriage.*' " (Emphasis added.)

Thus, we acknowledged that the confidential-communication privilege was preserved by the Legislature with respect to civil cases.

We next looked to the Gen. Stat. of 1872, ch. 203, §40, which stated:

> "The husband or wife of any respondent in a criminal prosecution, offering himself or herself as a witness, shall not be excluded from testifying therein because he or she is the husband or wife of such respondent."

This section, which deals with criminal matters and which is identical to the current statute G.L. 1956 (1969 Reenactment) §12-17-10, was passed by the Legislature 8 years after its civil counterpart. In ch. 203, §40, the Legislature chose not to add the confidential-communication proviso used in the civil statute. We reasoned at that time in *Kenyon*:

> " 'It might not accord with a good public policy to allow every litigant in civil suits about matters however small to have the right to search household secrets for the production of evidence. But the State should have all

possible constitutional means to ferret out and punish crime.'

"An examination of section 40 leaves no room for doubt as to its meaning. The husband or wife cannot be compelled to be a witness. There must be a voluntary offer, and upon such offer there can be no exclusion from testifying, because of the relationship to respondent. In other words, the witness is to testify as though the relationship did not exist."

It is a primary cannon of statutory construction that statutory intent must be gleaned from the words of the statute, if they are free from ambiguity and express a reasonable meaning. *Little* v. *Conflict of Interest Commission,* 121 R.I. 232, 237, 397 A.2d 884, 887 (1979); *Statewide Multiple Listing Service, Inc.* v. *Norberg,* 120 R.I. 937, 941, 392 A.2d 371, 373 (1978). Thus, where a statute is free from ambiguity, there is no room for statutory construction; and we must give the words their plain and obvious meaning. The Legislature has chosen not to change the language of §12-17-10, which is the same as the statute passed upon by this court in *State* v. *Kenyon, supra.* We find no fault with our reasoning in *Kenyon* and therefore hold that §12-17-10 has altered the common-law privilege of confidential communications between a husband and wife. Thus, Mrs. Angell was properly allowed to testify voluntarily against her husband.

The defendant's appeal is denied and dismissed, the judgment appealed from is affirmed, and the case is remanded to the Superior Court.

*Dennis J. Roberts II,* Attorney General, *John E. Migliaccio,* Special Assistant Attorney General, for plaintiff.

*William F. Reilly,* Public Defender, *Barbara Hurst,* Chief Appellate Attorney, for defendant.