In re John DOE.

In re Richard ROE.

In re Joseph ROE.

In re NANCY.

Nos. 79–92–Appeal to 79–94–Appeal and 79–166–Appeal.

Supreme Court of Rhode Island.

Jan. 28, 1982.

Paul J. Pisano, Atty. for Dept. of Mental Health, Retardation and Hospitals, Providence, for petitioners.

Carmine Rao, Joseph T. Feeley, Mental Health Advocates, Providence, for respondent.

## OPINION

WEISBERGER, Justice.

These four consolidated cases come before us on appeals from orders of the District and Family Courts either involuntarily committing a patient to the Institute of Mental Health (IMH) or recertifying a patient for retention in that facility after he or she has been confined therein for one or more six-month periods. An equally divided court had previously denied and dismissed these appeals. We, however, granted a subsequent motion for reargument. *In Re Doe*, R.I., 432 A.2d 327, *reh. granted*, R.I., 435 A.2d 330 (1981). Although the facts of all four cases pose similar problems, the cases are not identical and, therefore, a brief exposition of the facts of each will follow.

John Doe was civilly certified to the IMH by a justice of the District Court for care and treatment on July 7, 1978, pursuant to the provisions of G.L.1956 (1977 Reenactment) § 40.1–5–8. This certification was based upon findings that the patient was in need of care and treatment in a facility, that he would likely benefit therefrom, that his continued unsupervised presence in the community would create a likelihood of serious harm by reason of mental disability, and that no suitable alternatives to certification existed. These factual findings were made as required by statute upon a quantum of evidence determined to be beyond a reasonable doubt. On January 5, 1979, a petition was filed in the Sixth Division of the District Court pursuant to § 40.1–5–11,

seeking to recertify John Doe for an additional six-month period. It should be noted that this petition was not filed within a period of no less than fifteen days and no more than thirty days prior to the scheduled expiration date of a six-month period as required by the statute. It is undisputed that the recertification petition missed the target date by approximately twelve days.

Richard Roe has been a patient at the IMH continuously since at least March of 1976. He was last certified in July 1977. Because his records were lost, no certification petition in respect to Richard was filed until after the expiration of the statutory period. Consequently, on December 19, 1978, Richard was discharged and readmitted on an emergency petition pursuant to the terms of § 40.1–5–7. Thereafter, a certification petition was filed on December 28, 1978. This petition was challenged on the ground of lack of timeliness. The court rejected the challenge and found that the statutory requirements for certification were met by clear and convincing evidence.

Joseph Roe had been civilly certified to the IMH by a justice of the District Court on July 7, 1978. A petition for recertification for an additional six months was filed on December 28, 1978. It is undisputed that this petition missed the target date by approximately six days. The mental health advocate moved that the petition be dismissed and the patient unconditionally discharged pursuant to the provisions of § 40.1–5–11, which reads in pertinent part:

"At the expiration of the six (6) month period set forth in § 40.1–5–8(10) hereunder, or any subsequent six (6) month period following recertification pursuant to this section the patient shall be unconditionally released unless a recertification petition is filed by the official in charge of a facility or his designated agent within no less than fifteen (15) days and no more than thirty (30) days prior to the scheduled expiration date of a six (6) month period. A hearing must be held pursuant to said petition and a decision rendered before the expiration of said six (6) month period."

The trial court denied the motion, made the necessary statutory findings based upon clear and convincing evidence, and recertified Joseph.

Nancy was admitted to the IMH on an emergency certificate on December 15, 1978, after a history of attempted suicide. Subsequently, on December 28, 1978, a petition for civil-court certification was filed in the Family Court. This petition was challenged on the ground that it was filed two days beyond the ten-day period of emergency commitment authorized in § 40.1–5–7. The Family Court justice rejected this challenge and certified Nancy for a period of six months for care and treatment. He based his ruling in part upon Nancy's indication that she would be willing to remain at the IMH adolescent unit as a voluntary patient. It is undisputed, however, that the certification vitiated her proposed voluntary status. The required statutory findings were made in support of the certification on the basis of clear and convincing evidence.

All of the cases raise a common issue. May a District Court or Family Court justice certify or recertify a patient who is found by the appropriate quantum of evidence to be in need of care and treatment at a mental health facility when that patient's continued unsupervised presence in the community poses a likelihood of serious harm to the patient or to others—in the event that the petition is not filed within the time limitations set forth by statute even though all other requirements for certification have been met?

The Rhode Island Mental Health Law was carefully crafted in order to guarantee that the liberty of an individual patient would be scrupulously protected and that this liberty would be impaired only in the event of findings of stringent necessity by proof beyond a reasonable doubt in the case of an initial certification, and proof by clear and convincing evidence supporting identical findings in the case of a recertification. The statute provides for institutional review proceedings at least every ninety days, by a review panel composed of at least one

psychiatrist and two other mental-health professionals involved in treating the patient. § 40.1–5–10. The statute further provides, as indicated above, for unconditional discharge at the end of a six-month certification period unless the patient is recertified under the circumstances and in accordance with the timetable set forth in § 40.1–5–11. However, before we decide whether the time schedule for filing of recertification petitions or initial petitions is mandatory, as opposed to directory, some attention must be given to the result of this "unconditional release." The purpose of the statutory provisions for review is to ensure that a patient may not become forgotten or "warehoused" when the need for supervised care and treatment no longer exists. *See O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). These objectives are indeed worthy and merit faithful implementation by the judiciary.

Nevertheless, it must be remembered that the sanction for the procedural default is the discontinuing of treatment and an unconditional discharge of a patient who has been found by the court either beyond a reasonable doubt or by clear and convincing evidence to be in need of such care and treatment and whose unsupervised presence in the community would create a likelihood of serious harm to the patient or to others. It is true that the Legislature couches the "remedy" in terms of unconditional discharge, but that remedy might also be described in terms of ejection from the very facility where treatment may be given. We must take judicial notice of the well-known fact that there are patients in the IMH who literally are unable to survive outside that institution. The very thought of ejecting such patients, regardless of the consequences, because an official of the institution has failed to file a petition within the statutory time frame, absent a saving judicial discretion, is indeed a chilling concept. Even Draco of Athens might pause before including such a "remedy" in his code.

The concern for "Mad Ludwig of Bavaria"[1] and other horror stories have caused civil rights advocates and legal commentators to become more concerned about the civil liberties of the mentally ill than about their need for therapeutic response. Mental patients are unique in that those who are subject to involuntary commitment are by definition unable to make an informed choice for themselves about their need for treatment. They frequently are completely lacking in insight and indeed may be wholly in the grip of hallucination and thereby out of touch with reality.

We would find it unconscionable to withhold other kinds of medical treatment from patients in need thereof by way of imposing supposed sanctions upon errant officials. Suppose, for example, that officials of a hospital might be punished for some procedural default by being forbidden to perform necessary surgery or from dispensing needed medication to their patients; such a result would seem ludicrous, indeed. Nevertheless, we are urged to punish officials of a mental-health facility by ejecting patients who have been found by overwhelming evidence to be in need of treatment, unless the officials file a recertification petition within the rigid time constraints or discharge the patient and file an emergency certificate. However, there is no guarantee that the official will file and follow up upon such an emergency certificate more correctly than he filed the recertification petition. In such

---

1. In 1886, Ludwig II, King of Bavaria, after many years of extravagance and neglect of government business, was certified as insane by a commission consisting of two physicians, several asylum warders, and a senior police official. Upon certification of the monarch, a regency was proclaimed and the king was incarcerated in a small castle known as Schloss Berg near Munich. Two days after his incarceration, he was found drowned in Lake Starnberg along with Dr. Gudden, the principal medical member of the commission. As a comment upon this tragedy, his cousin, the Empress Elisabeth, commented:

   " 'The king was not mad; he was just an eccentric living in a world of dreams. They might have treated him more gently, and thus perhaps have spared him so terrible an end.' "

   W. Blunt, *The Dream King* (1970).

a situation we believe that the trial justice must have a reasonable area of discretion, such as was sought to be exercised by the trial justices in the cases at bar. Not only do we recognize that the statutes must be given their plain meaning but we also have often held that no statute should be construed in such a way as to reach an unjust, absurd, or unreasonable result.[2] *Coletta v. State*, 106 R.I. 764, 769, 263 A.2d 681, 684 (1970); *Wilkinson v. Harrington*, 104 R.I. 224, 239, 243 A.2d 745, 753 (1968); *Town of Scituate v. O'Rourke*, 103 R.I. 499, 512–13, 239 A.2d 176, 184 (1968).

■ The evident purpose of this statute was remedial. It was designed to establish a due-process framework for the commitment of mentally ill persons and for their periodic reevaluation. This remedial purpose would not, in our opinion, be furthered by depriving the patient of needed institutional care as a sanction for any deviation, however slight, from the statutory timetable. In situations where a slight delay on the part of a public officer might prejudice private rights or the public interest, it is a general rule of statutory construction that time provisions are construed to be directory. This is especially applicable where a mandatory construction might do great injury to persons not at fault. 2A Sutherland, *Statutory Construction* § 57.19 at 443 (4th ed. Sands 1973). We have recognized this rule of construction in *Tiverton v. Fraternal Order of Police*, 118 R.I. 160, 164–65, 372 A.2d 1273, 1275–76 (1977). As a consequence, we construe the time requirement as directory rather than as mandatory

and would accord the trial justice the discretion to allow retention of a patient who is in need of care even though a petition might not have been filed precisely within the period set forth in the commitment or recertification sections. *See Providence Teachers Union, Local 958 v. McGovern*, 113 R.I. 169, 177, 319 A.2d 358, 363–64 (1974).

■ Affording a trial justice discretion does not mean that the time provisions may be completely disregarded. Moreover, the failure of public officials to apply promptly for required judicial authorization to commit or retain involuntary patients may give rise to civil liability in the event that such a patient should be wrongfully deprived of his liberty. Such sanctions would be imposed upon the official and not upon the patient by depriving him of needed care and treatment.

■ In respect to the petition of Richard Roe, the IMH officials, realizing that there was a recertification gap of approximately a year and a half, discharged Richard on December 19, 1978. They then readmitted him on an emergency petition. Nine days later a petition for civil certification was filed pursuant to § 40.1–5–8. Our dissenting justices agree that this procedure was in accordance with statutory requirements. However, the trial justice, in hearing this petition, determined that the evidence presented in support thereof was "clear" and "convincing." This standard is appropriate for recertification proceedings, but not for an initial commitment, which requires proof beyond a reasonable doubt. As a consequence, we shall vacate the commit-

2. To paraphrase the sage comment of Justice Holmes, a page of history is often worth a volume of logic. When the present mental health law was enacted by P.L.1974, ch. 119, and approved on May 8, 1974, it provided that the terms of the act would become effective January 1, 1975. The presiding justice of the Superior Court and the director of Mental Health, Retardation and Hospitals strove to make preparation for the new hearing procedures. A courtroom was prepared in the Adolph Meyer Building of the Institute of Mental Health, electronic recording devices were installed, every effort was made to provide a context for hearings that would cause minimal distress to and movement of patients. Never-

theless, the civil commitment and recertification procedures were applicable to a very large number of chronic patients who were not in a position to make a voluntary choice to remain in the facility. Had the rigid time constraints been applied that are sought in these cases, it would have been physically impossible to file and complete hearings on all of the petitions made necessary by the new act. Certainly, the Legislature could not have intended to empty the Institute of Mental Health of its chronic and badly disturbed patients merely because time schedules were demonstrably impossible to meet. *See generally* Dep't of Mental Health, Retardation and Hospitals Ann.Rep. 5–9 (1974–75).

ment order of Richard Roe and remand the case to the District Court in order that the trial justice may reappraise the evidence in the light of the appropriate standard of quantum of proof.

Similarly, the finding of the Family Court justice in respect to Nancy was based upon an insufficient quantum of proof, since Nancy's certification was for an initial petition for commitment rather than a re-certification. Consequently, we shall vacate the commitment order of Nancy and remand the case to the Family Court in order that the trial justice may reappraise the evidence in the light of the appropriate standard of proof.

For the reasons stated, the appeals of John and Joseph are denied and dismissed. The orders of the District Court in these cases are affirmed. The appeals of Richard and Nancy are sustained, and the cases are remanded to the District and Family Courts respectively for further proceedings consistent with this opinion.[3] The papers in the cases may be remanded to the appropriate courts.

KELLEHER, Justice, with whom BEVI-LACQUA, Chief Justice, joins, dissenting.

With apologies to the late Justice Cardozo, the truly crucial issue before us can be framed in terms of a question that asks whether a mentally disturbed patient "shall go free" because the Department of Mental Health, Retardation and Hospitals "has blundered."[4] The answer, I submit, is yes because the General Assembly, by its employment of clear, concise, and explicit language, has mandated such a result. Taking a cue from my brother Weisberger, I too present for consideration a page of history, this time as chronicled by the Providence Journal.

In the Journal's March 27, 1974 edition at page A–5, one of the statehouse reporters

informed the reader that on the previous day a bill that sought a "broad revision of the state's mental health laws" had been introduced in the Rhode Island Senate. It was noted that the proposed legislation had been drafted by a committee of state officials and "private experts" and had attempted to satisfy patients'-rights requirements as "dictated by recent court decisions as well as current medical thinking in favor of greater community—rather than institutional—care." In a message accompanying the bill's introduction, then-Governor Philip W. Noel claimed that the act's passage would place Rhode Island among the leaders of states whose legislation represented an updated view of what was going on in the mental-health area.

On March 28, the Journal, in its lead editorial, urged speedy approval of the committee's efforts and emphasized that the proposed legislation had been the subject of a "most careful review." In urging a legislative O.K., the editorial characterized the approval as "handing the state Department of Mental Health, Retardation, and Hospitals a carefully prepared program for modernization of mental health treatment * * *" and as "guaranteeing the mentally ill a bill of rights too long lacking and sadly needed." I respectfully suggest that the majority, in construing § 40.1–5–11(3), have judicially amended the Mental Health Law of 1974 in such a manner that the guarantees alluded to in the 1974 editorial have been destroyed or substantially diminished.

In construing a statute, the judiciary cannot question the wisdom of its enactment. Words used in a statute are to be accorded their plain and usual meaning unless a contrary intent appears on the face of the statute. *Roadway Express, Inc. v. Rhode Island Commission For Human Rights*, R.I., 416 A.2d 673, 674 (1980); *Little v. Conflict Of Interest Commission*, R.I., 397 A.2d 884,

3. In the event that the patients have been discharged from the Institute of Mental Health during the pendency of this appeal, no further hearing will be required.

4. Noting dissatisfaction with the effects of the exclusionary rule in the context of criminal

cases, Justice Cardozo answered the question, should the criminal "go free because the constable has blundered?," in the negative. *People v. DeFore*, 242 N.Y. 13, 21, 150 N.E. 585, 587 (1926).

887 (1979). If there is no ambiguity to the language chosen by the Legislature, there is no need to look elsewhere for intent. A statute that declares itself needs no construction. *Citizens For Preservation Of Waterman Lake v. Davis*, R.I., 420 A.2d 53, 57 (1980); *Beaudoin v. Petit*, R.I., 409 A.2d 536, 539 (1979); *State v. Angell*, R.I., 405 A.2d 10, 15 (1979); *Vaudreuil v. Nelson Engineering And Construction Co.*, R.I., 399 A.2d 1220, 1222 (1979).

I submit that the legislative language that the majority concedes is "carefully crafted" amply demonstrates the deliberate choice made by the General Assembly when, in adopting § 40.1–5–11(3), it specifically declared that a patient involuntarily committed to a treatment facility for mental illness "shall be unconditionally released" unless a recertification petition has been filed by the official in charge of that facility within the first fifteen days of the final thirty days of the six-month period for which a prior certification has been obtained. It is obvious that in 1974 the committee that drafted the initial legislation and the General Assembly took the route espoused by those some of whom are referred to by my brother Weisberger as "civil rights advocates."

Evidence of the genuine legislative concern for the civil rights of the involuntarily committed can be seen by an examination of the bill proposed by the committee and the bill as it finally passed both branches of the Legislature. As drafted, the bill permitted the initial commitment and the subsequent recertification of an individual's need for continued treatment to be authorized by a simple showing of a fair preponderance of the evidence. Immediately after its introduction in the Rhode Island Senate on March 26, 1974, the bill was referred to the Committee on Health, Education, and

Welfare. Later, on April 30, 1974, the committee made two significant amendments to the bill. It changed the burden of proof so that an initial commitment order could be obtained only on "proof beyond a reasonable doubt" of the subject's need for treatment, and all subsequent recertification orders would be issued only on a presentation of proof by "clear and convincing evidence" of the patient's need for continued treatment.

I shall not guess what Draco would have done in 621 B.C. about the plight of the mentally ill in Athens, but I have no doubt that in 1974 the committee that drew up the legislation was well aware of the avalanche of mental-health litigation which had enveloped many states including Alabama, where a Federal District Court judge, in recognizing the involuntarily committed's right to treatment, described a Tuscaloosa mental-health facility as a hospital that had been converted into a penitentiary. *Wyatt v. Stickney*, 325 F.Supp. 781, 784 (M.D.Ala.1971); *see also Wyatt v. Aderholt*, 503 F.2d 1305 (5th Cir. 1974); *Wyatt v. Stickney*, 344 F.Supp. 387 (M.D.Ala.1972); *Wyatt v. Stickney*, 344 F.Supp. 373 (M.D. Ala.1972); *Wyatt v. Stickney*, 334 F.Supp. 1341 (M.D.Ala.1971).[5]

Unquestionably, Mad Ludwig's fate was a fait accompli in 1974. Nevertheless, in that year the General Assembly, by its use of simple, direct language calling for the unconditional release of an involuntarily committed patient and for a recertification hearing that "must be held" prior to the expiration of the current six-month period, demonstrated that individuals such as Ludwig or Rhode Island's John Doe and Joseph Roe had a right to immediate discharge once the statutory fifteen-day period prescribed in § 40.1–5–11(3) had expired with-

---

**5.** This court in *In re John Doe*, R.I., 390 A.2d 390, 393 (1978), alluded to the *Wyatt* cases and the Fifth Circuit Court of Appeals' belief that the civilly committed mental patient had a constitutional right to such individual treatment as would aid each either to be cured or to have his mental condition improved. On review, the Supreme Court of the United States took a different view in avoiding the constitutional question of whether such a patient is constitutionally entitled to treatment, and ruled that a state cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely outside a mental-health facility either on his own or with the help of family or friends. *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975).

out any attempt having been made to initiate the recertification process.

The observations expressed by my brother Weisberger as he describes his efforts as the Superior Court's presiding justice to implement the judicial provisos found in the 1974 legislation are quite interesting. The events he witnessed could justify a change in the act, but the change, if it is to come, must come by legislative action rather than by judicial fiat.

Having had my say concerning the reach of § 40.1–5–11(3), I turn to the appeals now before us. I would sustain all the appeals. Since there was no compliance with the time constraints specified in the recertification portion of the Mental Health Law, the District Court judge should have granted the mental-health advocate's motions to dismiss the recertification petitions relating to John and Joseph.

Nancy's appeal raises a unique question. An involuntary-commitment petition was filed two days after the ten-day emergency-commitment period prescribed in § 40.1–5–7 had expired. Nancy was present when the two-day overlap was disclosed to the Family Court justice. She indicated her willingness to remain at the IMH adolescent unit on a voluntary basis. The Family Court justice observed that the ten-day statute "must be strictly construed" but that since Nancy was a volunteer, the ten-day limitation would not be enforced. However, he then held a hearing and ruled that Nancy should be detained at the IMH for the ensuing six months. In taking this approach, the Family Court justice misconceived the nature of a voluntary admission.

The essence of voluntary commitment is the patient's right to leave the treatment facility at the end of the business day following the presentation of a written notice by the patient to a responsible official of his or her intent to leave the facility. Section 40.1–5–6(3). By certifying Nancy for six months, the Family Court justice effectively destroyed her status as a volunteer. If an individual is to be involuntarily committed to a treatment facility, such a commitment must take place within the legislative provisos found in § 40.1–5–8. Thus, if the officials at the IMH decided to have Nancy involuntarily committed, they were obliged to file a proper petition and to present evidence of the need of commitment by proof beyond reasonable doubt rather than by the clear-and-convincing standard employed by the Family Court justice.

As noted by the majority, neither the Chief Justice nor I have any objection to Richard's emergency certification. In fact, this legislative mechanism provides a vehicle whereby a responsible official may rectify any oversight of the strict deadline delineated in the 1974 legislation. But, as my brother Weisberger points out, the trial judge in the District Court, as did his counterpart in the Family Court, employed the wrong standard of proof, and, of course, Richard is entitled to a rehearing.