**Supreme Court**

No. 2012-326-C.A.
(P1/10-3568A)

State                    :

v.                    :

Roger Watkins.                    :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                        :

v.                      :

Roger Watkins.          :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.**  We are confronted in this case with the tragic, yet all-too-common scenario in which an adult in a position of authority uses that authority to engage in an inappropriate and illicit sexual relationship.  The defendant, Roger Watkins, appeals from a Superior Court judgment of conviction, having been found guilty by a jury of six counts of first-degree sexual assault and four counts of second-degree sexual assault, for which he was sentenced to fifty years, with twenty-five years to serve and twenty-five years suspended, with probation.  On appeal, the defendant argues that the trial justice erred in: (1) admitting evidence concerning prior acts of misconduct committed by the defendant against the complainant; (2) allowing an examining physician to testify to statements made by the complainant during the course of her treatment; and (3) denying the defendant's motion for a new trial.  For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

# I

## Facts and Procedural History

On November 23, 2010, a Providence County grand jury returned an eleven-count indictment charging defendant with seven counts of first-degree sexual assault and four counts of second-degree sexual assault on the complaining witness, Jessica.[1]  In May 2012, a trial was held in Providence Superior Court, during which the state presented six witnesses: Rodrick Shepard, Jessica's high school classmate and boyfriend; Patrolman Christopher Owens, a Providence Police officer and high school resource officer; Dr. Amy Goldberg, a pediatrician at Hasbro Children's Hospital; Lisa, Jessica's mother; Jessica; and Detective Christopher Rotella of the Providence Police Department.   We summarize only the testimony pertinent to this appeal.

## Patrolman Christopher Owens

Patrolman Christopher Owens of the Providence Police Department testified that in February 2010, he was the school resource officer at Hope High School.  He testified that he maintained an office at the school and acted "as a resource to students."  Due to the nature of his position, Ptlm. Owens had regular contact with the students at the school and, as a result, he became familiar with both Rodrick Shepard and Jessica.  Patrolman Owens testified to an incident that occurred on February 23, 2010.  He testified that he was in a meeting in his office when "[a] couple of teachers' aides came in and told [him] that there was a disturbance in the parking lot," and he responded immediately.

When he arrived outside, he saw defendant yelling at Shepard and noticed that defendant "was pretty upset."  Patrolman Owens asked what was going on, to which defendant replied "that his daughter should have been home * * * she should not have been in school."  The defendant

---

[1] In the interest of the minor victim's privacy, we will refer to both her and her mother by the use of fictitious names.

further explained to Ptlm. Owens that "he was in the shower at home and when he got out he noticed that she was gone" and, when he saw Jessica and Shepard in the parking lot "he thought that she may be bunking school."

Having defused the situation between defendant and Shepard, Ptlm. Owens testified that he saw Jessica in the parking lot with two school administrators; she appeared to be upset, and he "could tell that she was crying." While in the parking lot, Jessica told Ptlm. Owens that "if I go back home with [defendant] he's going to beat the hell out of me." Thereafter, Ptlm. Owens testified that he wanted to speak with all parties involved, so he had Shepard accompany the administrators while he spoke to Jessica and defendant alone in his office. Once back in his office, defendant refused to sit down, was yelling and using profanity, and was still visibly upset. Patrolman Owens testified that Jessica refused to look at defendant or answer any questions while he was in the room.

Shortly thereafter, Ptlm. Owens summoned the school psychologist, Mrs. Clarke, to speak with Jessica. Patrolman Owens testified that Mrs. Clarke is "a confidante to the kids in the school," and "sits in with just about every case * * * where they have female students." After Mrs. Clarke arrived, Ptlm. Owens had defendant transported to the administrator's office. With defendant out of the room, Jessica "broke down * * * hid her face in her hands and she started to cry uncontrollably." The defendant was arrested shortly thereafter, and Jessica was brought to the Providence police station to give a written statement.

**Doctor Amy Goldberg**

The state next called Dr. Amy Goldberg, a pediatrician at Hasbro Children's Hospital and the supervisor of the Child Protection Program, a program that evaluates children who are potential victims of maltreatment. She testified regarding the results of a March 3, 2010 examination that she performed on Jessica. Much of Dr. Goldberg's substantive testimony involved her examination of Jessica, during which Jessica recounted a lengthy history of sexual abuse at the hands of defendant. Doctor Goldberg testified that Jessica reported that the sexual abuse started around the time she was fourteen-years-old, when defendant would touch her over her clothes. Eventually, this touching progressed to touching underneath the clothes and digital/vaginal penetration. When Jessica was approximately sixteen-years-old, the abuse progressed to penile/vaginal and oral/vaginal penetration. Doctor Goldberg testified, over defense counsel's objection, that Jessica said that she became "increasingly more afraid" during this period when the sexual assaults were taking place. In addition to Jessica's increasing fear, Dr. Goldberg testified that "there [were] other forms of * * * more subtle fear and feelings of fear * * * in regards of not being able to * * * go to school."

Doctor Goldberg testified that Jessica told her that, when the digital penetration began, it was in the context of Jessica pretending to be asleep and being too afraid to tell defendant to stop. Jessica told Dr. Goldberg that the sexual encounters progressed and that defendant would tell her that she could not go to school unless she would perform sexual acts. Doctor Goldberg testified that at the time of the examination, Jessica was less than three weeks removed from the most recent sexual encounter with defendant. During that most recent encounter—vaginal intercourse—Jessica said that she had complained of pain and asked defendant to stop, but he refused. Doctor Goldberg further testified that, based upon her evaluation, she had concluded to

a reasonable degree of medical certainty that there had been vaginal penetration. She then testified that she recommended Jessica for follow-up treatment, although she did not specify the nature of the treatment.

### Jessica's Mother

Jessica's mother, Lisa, testified that she met defendant in 1983 and the two began dating shortly thereafter. By 2006, she and defendant were living in an apartment in Providence with their three children, as well as Lisa's daughter, Jessica. She testified that by this time she and defendant were no longer dating; however, they continued to live together because "[h]e was there to help take care of the kids." Lisa testified that defendant came into Jessica's life when she was a baby. As part of taking care of the children, defendant would "take them out to places[,] * * * buy their clothes, feed them," as well as stay involved in their sports and activities.

Lisa also testified at length about defendant's role as the household disciplinarian. Lisa herself was not involved in the disciplining of her children because she "was easy on the kids so [defendant] didn't like the way I disciplined [Jessica] so he took over." This discipline, which was referred to in the household as being "on punishment," involved "whip[ping] the behind," keeping Jessica in her room without access to the phone, computer, or television, and not allowing her to date or see her friends. Lisa testified that, while Jessica was "on punishment," defendant treated her differently from the way he treated the other children; for instance, he required her to do the other children's chores around the home. The defendant would also keep Jessica home from school while she was "on punishment," sometimes for days on end, and would force her to watch two to three hours of television with him at night. Lisa testified to a specific instance in which Jessica attended a baby shower with her boyfriend, Shepard; defendant

did not approve of Jessica and Shepard's relationship, so he "kept her out of school for like a week."

Lisa testified to seeing defendant wrestling with the children from time to time; she added that, after one particular wrestling match, Jessica complained to her that defendant had grabbed her breasts. She testified that she did not think much of her daughter's complaint, and that, apart from the wrestling incident, she was unaware of any of the allegations by her daughter against defendant until after his arrest in February 2010.

**Jessica**

The complainant, Jessica, testified at length about her relationship with defendant. She testified that she remembered defendant moving in with her family when she was approximately eleven-years-old, and that he lived with them virtually the entire time up until his arrest in February 2010. Jessica testified that defendant was involved in her "whole life, like everything that [she] did," including her schooling. Jessica testified that, when she started at Hope High School in 2006, defendant would frequently check on her attendance, often dropping by the high school at random to see that she was attending class and to talk to her teachers to make sure she was completing her work. In addition to monitoring how Jessica went about her schooling, defendant also took control over where and when she went to school. Jessica testified that, although she started at Hope High School, she "was getting in so much trouble" that defendant removed her to Adelaide High School midway through her sophomore year. While at Adelaide, Jessica began dating a boy, Kelvin. However, defendant did not approve of her dating, so he ordered her not to contact Kelvin, kept her out of school, and ultimately transferred her back to Hope High School.

Although she testified about defendant's role in her school life, the bulk of Jessica's testimony revolved around defendant's role as the household disciplinarian, which started "as far back as [she could] remember." This involved defendant doling out punishment, such as confining Jessica to the house, taking things from her, and forbidding her to be in contact with her friends. Further, as part of her punishment, Jessica was required to watch twenty hours of television with defendant each week; defendant would write down and keep track of the number of hours. Jessica testified that, with the exception of a brief period around Halloween when she was in the tenth grade, she was "on punishment" for "three years straight," all through the tenth, eleventh, and twelfth grades. Jessica also testified to alleged acts of corporal punishment and sexual conduct that took place at the hands of defendant during this time period—the testimony about which partially forms the basis of the instant appeal.[2]

With respect to the corporal punishment, Jessica testified to an incident in which she was using defendant's daughter's phone to talk with Kelvin—which defendant had prohibited her from doing. She testified that when defendant found out she had used the phone, "he came in the room and then he slapped me * * * kept telling me shut up," and "[p]ut his hands around my neck and put me up against the wall."[3]

---

[2] Prior to trial, defense counsel argued in limine to exclude the incidents of corporal punishment and uncharged sexual contact. The trial justice withheld ruling on the corporal punishment until trial and allowed the admission of the uncharged sexual contact under Rule 404(b) of the Rhode Island Rules of Evidence. During trial, the trial justice addressed the uncharged conduct once again, stating that he weighed the proffered testimony under Rule 403 of the Rhode Island Rules of Evidence and Rule 404(b) and would permit the witness to testify to the corporal punishment and would issue a limiting instruction to the jury.

[3] It bears mentioning that at no time during this testimony did defense counsel object to the state's questioning or the witness's answers. At the hearing on the motions in limine, however, defense counsel objected to the admission of the testimony as "not reasonably necessary for the [s]tate to get into that area," and "unduly prejudicial to [defendant]." At trial, the trial justice revisited his ruling from the motion in limine, and, pursuant to defense counsel's previous objection, offered to give a limiting instruction after the elicitation of the testimony; the trial

Jessica also testified to uncharged sexual conduct; specifically, instances of "play fighting" that took place between her and defendant in which he would "[g]rab [her] in [her] vagina or chest." She testified that "[f]or as long as [she could] remember" she and her little sister would "play fight" with defendant two or three times a week, which would consist of them "attack[ing] him * * * trying to restrain each other and trying to hold him down." However, Jessica also testified that, when they would "play fight," defendant would grab and hold her vagina and breasts over her clothing. Although defendant would do this to Jessica "most of the time" when they would "play fight," she testified that she never saw defendant grab her sister in the same way.

Jessica's testimony portrayed a course of progressively escalating sexual misconduct perpetrated by defendant. It began when Jessica was in tenth grade when the two would watch television on the couch, and she would eventually fall asleep. She testified that the first time it happened, she woke up to find defendant next to her on the couch, touching her vagina in a massaging motion over her clothing. Jessica pretended to be asleep because she "was afraid of his reaction if [she] would have woke[n] up and seen him doing that or what he would say." She testified that this happened about twice a week. She testified that she did not tell anyone about defendant's behavior because she "didn't think anyone would believe [her]." Although the pattern stayed the same during the first half of Jessica's tenth-grade year—falling asleep on the couch and awakening to defendant touching her privates—defendant soon progressed to touching her breasts and vagina beneath her clothes. Shortly thereafter, during the spring of her tenth-grade year, defendant began penetrating her vagina with his finger.

---

justice understood the grounds for defense counsel's objection and ruled accordingly, sufficiently preserving the issue for our review. See State v. Baptista, 894 A.2d 911, 914 n.2 (R.I. 2006).

By the time Jessica was a junior in high school, the sexual encounters were no longer just taking place while she pretended to be asleep. Jessica testified that, when she would get in trouble in school, defendant would keep her out of school unless she would perform sexual acts with him. Jessica testified that it began with defendant performing oral sex on her in the basement laundry room of their home. When asked how many times this happened to her, she stated: "I can't count. I can't give you an exact number of how many times it happened." She testified that these encounters continued through her junior year of high school and into her senior year, but that she never told him to stop because she was afraid. She further testified that, when she was "on punishment" towards the end of her junior year, defendant told her that she would not be able to go back to school and that he would homeschool her unless she gave him oral sex. She then elaborated on the numerous occasions in which defendant would set a stopwatch and force her to perform oral sex on him until the allotted time ran out. This arrangement—defendant threatening to take Jessica out of school unless she performed sex acts on him, and her complying—continued well into her senior year of high school.

Jessica testified that, shortly before defendant's arrest in February 2010, defendant found out that she had been talking on the phone with her boyfriend, Shepard. As punishment, defendant once again threatened to keep her out of school, although this time, in order to return to school, she had to have sexual intercourse with him. The defendant, as he often did, wrote his demand down on a piece of paper and gave it to Jessica. The two then waited for Lisa and the other children to leave the house and they went into the bedroom where defendant had Jessica remove her clothes and lie on the bed. The defendant then attempted to insert his penis into her vagina; however he stopped when Jessica started to cry and told him that it hurt.

Jessica then testified to the confrontation that occurred between defendant and Shepard, which led to the meeting at school and, ultimately, defendant's arrest. On that day, February 23, 2010, defendant was once again attempting to keep Jessica out of school; however, when he got in the shower, Jessica boarded a bus bound for her high school. When asked at trial why she left her house that day, she stated: "Because I knew what was going to happen. * * * He was going to tell me to do something with him sexually."

### Detective Christopher Rotella

The state's final witness, Det. Christopher Rotella of the Providence Police Department, testified to taking Jessica's and defendant's respective statements on February 23, 2010. Detective Rotella testified that, after being advised of his Miranda[4] rights, defendant gave a verbal statement that was audio recorded. The recording was entered as a full exhibit at trial and was played in its entirety while members of the jury read along with a transcribed copy.[5]

The recording, which ran for approximately forty-three minutes, consisted essentially of defendant narrating in explicit detail his relationship with Jessica. The details given by defendant largely mirrored those testified to at trial by both Dr. Goldberg and Jessica. For instance, defendant talked about "play fighting" with Jessica, during which time he would grab her crotch in "kind of like a sexual nature," yet, he claimed that "it was never anything more than that." Later on in his statement, defendant described the transition from "play fighting" to sexually assaulting Jessica while she was asleep on the couch, stating: "We would sit on the couch and we'd watch TV. She would fall asleep. I would feel on her. I would finger her." When asked specifically which parts, defendant replied, "her thighs, her legs, her chest. You know, all the essential parts and stuff like that." He described how Jessica "acted like she was

---

[4] Miranda v. Arizona, 384 U.S. 436 (1966).
[5] The transcribed copy was not entered as a full exhibit.

- 10 -

asleep," but that he nevertheless "believe[d] it was consensual." When asked whether Jessica gave him permission to perform these acts on her when she was asleep, defendant stated that "she didn't give me permission, but * * * I know it was consensual," because "she knew * * * and she didn't mind."

The defendant's statement, much like the testimony of Dr. Goldberg and Jessica herself, described how the sexual encounters escalated over time. Although he could not pinpoint the exact number of times, defendant attested to numerous occurrences that took place in the basement laundry room, including his making oral/vaginal contact, as well as repeated contact with Jessica's chest. He then described how he would only permit Jessica to return to school in exchange for sex acts, including sexual intercourse. Specifically, he stated that "when [he] was going to take [Jessica] out of school * * * [they] had sex so she could stay at Hope [High School]." He recalled how the arrangement came about; the two were sitting on the couch and he proposed to Jessica, "if you want to fool around, you can stay at Hope." The defendant then recounted telling Jessica "that if she bumps any more classes or school that she has to have sex again * * * or just leave the school." The defendant stated that, although he was the one who proposed the arrangements, it was Jessica who agreed to them. When asked whether he thought that it was wrong to forbid her to go to school unless she had sex with him, he admitted that it "was definitely wrong." He stated that it was wrong to take advantage of her because of her age, because he is "an authority" and "control[s] what she can do and can't do."

In addition to narrating the sexual history, defendant's statement also told of his role as the household disciplinarian. For instance, defendant described keeping Jessica "on punishment" for three years straight because, as he described, she was "better off." The defendant also recounted the incident, testified to by Jessica, in which he punished her for using the phone

- 11 -

without permission: "I grabbed [her] by the neck; I pushed her up against the wall. I said, 'Don't you ever disrespect me like that again.' * * * I probably grabbed her neck and held her for less than three or four seconds." He admitted that Jessica was in fear, and that "[s]he knew that if she messed up that [he] could hurt her."

At the conclusion of the trial, defendant was found guilty by a jury of all counts against him.[6] On July 18, 2012, the trial justice sentenced defendant to fifty years at the Adult Correctional Institutions, with twenty-five years to serve and twenty-five years suspended, with probation. The defendant filed a timely notice of appeal. On appeal, defendant argues that: (1) the trial justice abused his discretion by allowing testimony regarding defendant's acts of corporal punishment, as well as the uncharged incidents of sexual contact that occurred during the "play fighting"; (2) the trial justice erred in allowing Dr. Goldberg to testify to hearsay statements that improperly bolstered Jessica's testimony; and (3) the trial justice erred in denying defendant's motion for a new trial because the interests of justice did not support the verdict.

We will address each of defendant's contentions in turn, and supply additional facts as necessary to resolve the issues before this Court.

## II

### A

#### "Play Fighting" and Corporal Punishment Testimony

Prior to trial, the state moved in limine to admit under Rule 404(b) of the Rhode Island Rules of Evidence the testimony regarding the "play fighting" that occurred, in which defendant would grab Jessica's vagina over her clothing. The state argued that the evidence was probative of defendant's larger plan of "grooming her for the sexual abuse that would come." The trial

[6] Count 10, charging defendant with first-degree sexual assault, was dismissed by the state pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure due to insufficient evidence at trial.

justice granted the motion, finding the evidence admissible under Rule 404(b) as probative of defendant's "all-encompassing scheme or plan," and "as showing some type of lewd disposition or intent on the part of the defendant towards this young woman."

The state also moved in limine to admit the testimony regarding the incident in which defendant pushed Jessica up against a wall and grabbed her neck, arguing that that incident was probative of the coercion element of sexual assault—specifically, psychological coercion. The trial justice reserved judgment until trial and ultimately admitted the evidence. The trial justice issued limiting instructions to the jury regarding both the "play fighting" testimony and the testimony on corporal punishment.

On appeal, defendant argues that the trial justice erred in admitting the "play fighting" evidence because it was not essential to the state's case and served no purpose "but to paint [defendant] as a depraved sexual predator." Further, defendant argues that the admission of the evidence was unfairly prejudicial. With respect to the corporal punishment, defendant argues that the evidence did not pertain to the sexual assaults charged in the case and that the admission of such evidence was unfairly prejudicial and "bound to improperly infect a jury's assessment of the evidence."

### 1. Standard of Review

"In reviewing the admission or exclusion of evidence, it is well settled that '[t]he admissibility of evidence is within the sound discretion of the trial justice, and this Court will not interfere with the trial justice's decision unless a clear abuse of discretion is apparent.'" State v. Clay, 79 A.3d 832, 838 (R.I. 2013) (quoting State v. Rios, 996 A.2d 635, 638 (R.I. 2010)).

## 2. Discussion

Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith." Rule 404(b) therefore prohibits the admission of "evidence of a defendant's 'crimes, wrongs, or acts * * * to prove that the accused has a criminal disposition and, therefore, is more likely to have committed the crime for which he [or she] stands accused * * * .'" Clay, 79 A.3d at 838 (quoting State v. Martinez, 59 A.3d 73, 85 (R.I. 2013)). However, Rule 404(b) does permit the admission of such evidence "for other purposes, such as proof of motive, opportunity, intent, preparation, [or] plan * * * ."

This Court has stated that Rule 404(b) "does not require exclusion of otherwise legally probative evidence simply because such evidence might also suggest past criminal activity." Martinez, 59 A.3d at 85 (quoting State v. Garcia, 743 A.2d 1038, 1051 (R.I. 2000)). Further, "evidence of prior bad acts is admissible 'if such evidence has independent relevance in respect to the proof of an element material to the chain of proof of the crime in issue.'" Id. (quoting Garcia, 743 A.2d at 1052). We have stated that, in the context of sexual assault cases, "[w]hen charges of sexual abuse hinge upon a credibility contest between defendant and [a] child complainant, relevant evidence of prior sexual misconduct is reasonably necessary to support the complainant's testimony." State v. Mitchell, 80 A.3d 19, 29 (R.I. 2013) (quoting State v. Mohapatra, 880 A.2d 802, 808 (R.I. 2005)).

We readily acknowledge that "[t]he line between Rule 404(b) evidence presented for the impermissible purpose of demonstrating propensity and Rule 404(b) evidence presented for one of the specific non-propensity exceptions is both a fine one to draw and an even more difficult one for judges and juries to follow." Martinez, 59 A.3d at 86 (quoting State v. Rodriguez, 996

A.2d 145, 150 (R.I. 2010)). Yet, "[h]owever difficult the task, the trial justice must exercise his or her sound discretion in fixing that line and deciding whether this type of evidence should be admitted, excluded, or limited." Id. (quoting State v. Ciresi, 45 A.3d 1201, 1211 (R.I. 2012)). "In deciding whether the trial justice abused his or her discretion in admitting the Rule 404(b) testimony, 'we look to the trial justice's reasons that underlie the ruling.'" Id. (quoting State v. Dubois, 36 A.3d 191, 200 (R.I. 2012)).

Although evidence may be deemed admissible under Rule 404(b), it is nevertheless subject to the balancing test laid out in Rule 403 of the Rhode Island Rules of Evidence, which excludes otherwise relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, * * * misleading the jury, * * * or needless presentation of cumulative evidence." "Therefore, Rule 403 'is always a consideration in a trial justice's ruling on the admissibility of Rule 404(b) evidence.'" Clay, 79 A.3d at 838 (quoting State v. Mlyniec, 15 A.3d 983, 997 (R.I. 2011)).

### a. "Play Fighting" Testimony

After considerable on-the-record analysis, the trial justice found that the evidence of the "play fighting" was probative of defendant's disposition or intent towards Jessica as well as part of defendant's scheme or plan "leading up to the charge of an alleged criminal behavior." In so finding, the trial justice likened the facts of the instant case to the facts in State v. Baptista, 894 A.2d 911 (R.I. 2006),[7] in which this Court upheld the admission, pursuant to Rule 404(b), of

---

[7] The facts in Baptista bear a striking similarity to the case at bar. In Baptista, much like the instant case, the defendant was convicted of multiple counts of first-degree sexual assault against his teenage stepdaughter. Baptista, 894 A.2d at 912. Prior to trial, the state argued that the uncharged acts were admissible to show force and coercion, as well as to demonstrate the defendant's lewd disposition or intent towards the victim. Id. at 913. The trial justice allowed the testimony, which, while sparing the unsavory details, we note was considerably more graphic than the play fighting testimony in the instant case. Id. Thereafter, the trial justice issued a limiting instruction to the jury. Id.

testimony regarding uncharged sexual assaults perpetrated by the defendant against the complainant. In the case under review, the trial justice found that the testimony, "if * * * accepted by the jury, * * * would certainly fit in with the [s]tate's theory of the case." During the motions in limine, the trial justice agreed to issue an instruction to the jury at trial, limiting their consideration of the evidence.[8]

The trial justice also articulated, albeit briefly, his rationale for allowing the testimony in the context of Rule 403, stating: "I have taken [Rule 403] into consideration in making a decision as to [the testimony] and I do believe it is probative evidence. I don't feel that it is extremely prejudicial to the extent that it should be excluded from the jury's consideration."

Upon review, it is apparent to us that the trial justice did not abuse his discretion under Rule 404(b) and Rule 403 in admitting the "play fighting" testimony. After much consideration, the trial justice allowed the testimony. He then issued a proper and thorough instruction to the jury. We likewise agree with the trial justice's assessment of the evidence under Rule 403; considering the wealth of other contemptible testimony regarding defendant's illicit relationship

---

[8] At trial, after Jessica testified to the "play fighting," the trial justice issued the following instruction to the jury, to which defendant voiced no objection:

> "You just heard the description of this witness as what she described as play fighting and alleged touching of her private areas of her body. Again, this is one of those areas where you only consider what is charged in this case. This defendant is not charged with any offense related to that particular conduct that she alleges occurred between her and this defendant. So I'm instructing you at this time that in considering that testimony about play fighting, again, it is for a limited purpose which you cannot consider it for is to conclude that this defendant has some criminal or bad character because of that incident that was just described or put another way that he is a bad person and therefore he has the tendency to commit the crimes that he is charged with in this case.
> "Your considering of that testimony, should you choose to accept it, is offered for the limited purpose of proving the defendant's intent towards this defendant [sic] or to show some common scheme or plan on his part with respect to conduct directed towards this witness."

with Jessica, we are hard-pressed to conclude that defendant was unfairly prejudiced by testimony concerning the inappropriate touching that occurred during their "play fighting." Because we perceive no abuse of discretion, we have no cause to overturn the trial justice's ruling.

### b. Corporal Punishment

Similar to the "play fighting" testimony, the admission of evidence regarding defendant's physical discipline of Jessica stands on substantially the same footing; the state moved in limine to admit testimony concerning defendant grabbing Jessica by the neck and pushing her up against a wall. However, unlike the "play fighting" testimony, the trial justice reserved until trial the decision on whether to admit the testimony on corporal punishment. The defendant argues that this "uncharged physical assault did not pertain to the sexual assaults charged in this case," and, further, that "the altercation was an isolated incident, which could not * * * create an environment of implied physical threats."

The defendant was charged with multiple counts of first-degree and second-degree sexual assault, each of which required the state to prove force or coercion beyond a reasonable doubt. See G.L. 1956 § 11-37-2(2); § 11-37-4(2). The state argued that the sexual assaults "occurred not through force, but through a level of psychological coercion based on * * * defendant's position of authority and his level of dominance overall in the household." This Court has held that psychological coercion is sufficient to prove the force or coercion element of sexual assault, even in the absence of physical force. See State v. Burke, 522 A.2d 725, 735 (R.I. 1987) ("Sexual submission induced by fear is not the product of consent but of coercion. * * * A command on the part of one who possesses complete authority and overwhelming force to back

- 17 -

up that authority need not be accompanied by an explicit threat in order to be effectively coercive.").

The testimony regarding the cell phone incident was not offered to show defendant's propensity for violence; rather, it was submitted as an illustration of defendant's role as the household disciplinarian, as well as the power and influence he wielded over Jessica. In a previous sexual assault case, we upheld the admission, under Rule 404(b), of testimony concerning a defendant stepfather's role as disciplinarian as "probative of the degree of control, supervision, and discipline [the] defendant exercised over his stepdaughters." State v. Brigham, 638 A.2d 1043, 1046 (R.I. 1994). Just as in the instant case, the state's theory in Brigham "was that [the] defendant used his position as disciplinarian and head of the household to psychologically coerce [the victim] into the sexual acts." Id. We held that the admission of such evidence was reasonably necessary to the state's case and, coupled with an appropriate limiting instruction, was properly admitted under Rule 404(b). Brigham. 638 A.2d at 1046. In the case currently before us, it was necessary for the state to prove the element of force or coercion; therefore, admission of evidence in furtherance of that burden was permissible under Rule 404(b). See Martinez, 59 A.3d at 85.

Finally, we cannot agree with defendant's contention that the admission of this testimony was unfairly prejudicial under Rule 403. As iterated supra, the testimony concerning the corporal punishment was probative of the state's case and was weighed by the trial justice against the possibility of unfair prejudice to defendant. The evidence of corporal punishment was properly admitted pursuant to Rules 404(b) and 403; thus, we perceive no abuse of discretion on the part of the trial justice.

**B**

**Doctor Goldberg's Testimony**

The defendant's next contention concerns the admission of lengthy portions of Dr. Goldberg's testimony. Specifically, defendant argues that the trial justice erred in allowing Dr. Goldberg to testify to the issue of whether the sexual contact was the result of force or coercion, which was "the sole issue at trial." This testimony, defendant contends, was inadmissible hearsay that did not fall under the exception for medical treatment or diagnosis and that "served only to improperly bolster the complainant's credibility." The defendant also claims error with respect to Dr. Goldberg testifying that she recommended Jessica for follow-up treatment, claiming that it "effectively rubber-stamped the complainant's testimony by indirectly implying that the witness's allegations were credible enough to merit professional treatment."

**1. Standard of Review**

"[A] determination of whether an out-of-court statement meets an exception to the hearsay rule is within the trial justice's discretion." State v. Martin, 68 A.3d 467, 475 (R.I. 2013) (quoting Rhode Island Managed Eye Care, Inc. v. Blue Cross & Blue Shield of Rhode Island, 996 A.2d 684, 692 (R.I. 2010)). "Under this standard, a trial justice's ruling will be upheld unless abuse of discretion that prejudices the complaining party is shown." Id. (quoting State v. Brown, 9 A.3d 1240, 1247 (R.I. 2010)).

- 19 -

## 2. Discussion

"Hearsay evidence is a statement, other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted." State v. Lynch, 854 A.2d 1022, 1030 (R.I. 2004) (quoting State v. Angell, 122 R.I. 160, 167, 405 A.2d 10, 14 (1979)); see Rule 801(c) of the Rhode Island Rules of Evidence. "As a rule, hearsay statements are excluded from the evidence introduced at trial because the usual safeguards of the oath, confrontation, and cross-examination, are not available." Lynch, 854 A.2d at 1030. There are myriad exceptions to the rule, including Rule 803(4) of the Rhode Island Rules of Evidence, which allows for the admission of "Statements for Purposes of Medical Diagnosis or Treatment." Rule 803(4) allows:

> "Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment, but not including statements made to a physician consulted solely for the purposes of preparing for litigation or obtaining testimony for trial."

Therefore, "[t]he test for determining admissibility 'hinge[s] on whether what has been related by the patient will assist or is helpful in the diagnosis or treatment of [the patient's] ailment.'" State v. Gaspar, 982 A.2d 140, 151 (R.I. 2009) (quoting In re Andrey G., 796 A.2d 452, 456 (R.I. 2002)). "Statements that narrate details unconnected with either diagnosis or treatment, however, are inadmissible unless they fall under another hearsay exception." Id.

In the instant case, Dr. Goldberg testified to numerous allegations made by Jessica during her March 3, 2010 evaluation. Over defense counsel's objection, Dr. Goldberg testified that Jessica "told [her] how she had begun to feel over time that the abuse progressed"—specifically, that "[s]he was increasingly afraid and there was some, there w[ere] other forms of sort of more

subtle fear * * * ." She also testified that "[Jessica] would tell [her] that she would be told to do sexual acts in order to be able to go to school." Defense counsel objected and asked for a curative instruction, arguing that it was "not a statement made for the purposes of diagnosis and treatment." The state argued that, because the doctor testified that "part of her diagnosis and treatment is the patient's psychological well-being" and that "this kind of psychological pressure or manipulation would be something that she factors in to her evaluation * * * ." The trial justice overruled the objection, finding that asking questions regarding the circumstances of the alleged acts is "part and parcel of what [the doctor] does" as a pediatrician specializing in child abuse. The issue before us, therefore, is whether Jessica's statements to Dr. Goldberg were made for the purposes of treatment or diagnosis sufficient to allow admission pursuant to Rule 803(4).

As a specialist in child abuse pediatrics, Dr. Goldberg testified that her evaluations "pertain[] to a patient's physical as well as mental health." She further testified that part of her role is to make referrals for follow-up treatment to other, more specialized doctors, oftentimes psychologists or psychiatrists. The referrals, she testified, are tailored based on what she learned from the patient and may involve a psychological component depending on the nature of the sexual abuse. Her ultimate objective in terms of treating patients and referring them to other doctors is "[t]o mitigate the effects of sexual abuse," which include depression and "different types of traumatic stress disorders." Therefore, we are satisfied that the trial justice was correct in finding that "part and parcel" of what Dr. Goldberg does is ascertain the circumstances surrounding the sexual abuse.

In the context of Rule 803(4), we have consistently held that, "[w]hen statements about causation enter the realm of assigning fault, it is unlikely that the patient or the physician consider them related to diagnosis or treatment." Gaspar, 982 A.2d at 151; see State v. Pina, 455

- 21 -

A.2d 313, 315 (R.I. 1983). Nevertheless, a statement made to a treating physician is not per se inadmissible merely because it involves the patient's emotional state; when an evaluation contains a psychological element as well as a physical one, those statements, much like the physical evaluation, may be pertinent to diagnosis and treatment. See Vallinoto v. DiSandro, 688 A.2d 830, 840-41 (R.I. 1997) ("[Patient] was being treated for psychological ailments, not physical ones, and the statements made by her to her social worker regarding her sexual activity with [the defendant] were directly relevant to the diagnosis of her mental state and the treatment that she was receiving * * * ."). We have also stated that, if the alleged perpetrator is a member of the victim's household, his or her identity may be pertinent both to the formulation of an effective treatment plan and to ensuring that the child is safe and the treatment can be effectuated. Lynch, 854 A.2d at 1031. However, the simple fact that a statement could be helpful in diagnosis is not in itself sufficient for admission under Rule 803(4); there must be a proper foundation establishing that the challenged statements were in fact made for the purpose of treatment or diagnosis. Lynch, 854 A.2d at 1031.

Although Dr. Goldberg did testify that she evaluates patients "both from a medical standpoint as well as from an emotional or mental health standpoint," she did not specifically testify that the statements Jessica made about her mounting fear of defendant or those regarding the exchange of sex for school attendance were made for the purpose of diagnosis or treatment. By Dr. Goldberg's own admission, her evaluations are more centered on the physical trauma rather than the psychological, and her role "really is to evaluate children from a medical standpoint." Although Dr. Goldberg's testimony regarding Jessica's statements may have qualified as a statement for the purposes of medical treatment or diagnosis, there simply was insufficient foundation to establish that they were, in fact, made for that purpose. There was no

testimony about how Jessica's statements were, or even could have been, used by Dr. Goldberg in making her treatment referral; her testimony that her role involves a psychological component, without more, is not enough to admit Jessica's statements regarding her fear of defendant as a Rule 803(4) exception. See Lynch, 854 A.2d at 1031. Accordingly, because Dr. Goldberg's testimony failed to adequately describe how Jessica's statements factored into her treatment or diagnosis, the statements do not fall under Rule 803(4) and were admitted erroneously.

Although we find that there was not a proper foundation for the admission of Jessica's hearsay statement concerning the possibility of psychological coercion as testified to by Dr. Goldberg, we are satisfied that such testimony is cumulative and harmless in light of the abundance of evidence properly admitted at trial. We have stated that "the admission of hearsay evidence is not prejudicial when the evidence is merely cumulative and when [the] defendant's guilt is sufficiently established by proper evidence." State v. Robinson, 989 A.2d 965, 979 (R.I. 2010) (quoting Lynch, 854 A.2d at 1032). "[C]umulative evidence" is "that which tends 'to prove the same point to which other evidence has been offered.'" Id. (quoting Lynch, 854 A.2d at 1032). The test to determine whether or not an item of evidence is cumulative "is a retrospective one, administered at the close of all the evidence to determine whether the admission of certain evidence was harmless in light of all the evidence admitted on that point." Id. (quoting Lynch, 854 A.2d at 1032).[9]

Although Dr. Goldberg's testimony was the first time the jury heard of Jessica's fear of defendant and their sex-for-school quid pro quo, it certainly was not the last. Jessica testified to multiple instances in which defendant would not permit her to return to school unless she performed sexual acts with him. It is likewise apparent from the evidence that defendant, by

---

[9] "In order to meet the harmless-error test, there must be proof 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" State v. Smith, 446 A.2d 1035, 1036 (R.I. 1982) (quoting Chapman v. California, 386 U.S. 18, 24 (1967)).

virtue of his role as the household disciplinarian, had instilled such a sense of fear in Jessica that she felt as if she had no choice but to acquiesce to his sexual demands. In light of the fact that Dr. Goldberg's testimony was corroborated by Jessica and, in part, by defendant himself, it is clear that her testimony was merely cumulative and that defendant was not unduly prejudiced by its erroneous admission. Therefore, we hold that the admission of the hearsay statements at issue does not warrant reversal by this Court.

We turn next to defendant's contention that Dr. Goldberg's testimony "indirectly impl[ied] that [Jessica's] allegations were credible enough to merit professional treatment," and thus constituted improper bolstering. We have defined impermissible bolstering[10] as what "typically occurs when one witness offer[s] an opinion regarding the truthfulness or accuracy of another witness'[s] testimony." Martin, 68 A.3d at 476 (quoting State v. Arroyo, 844 A.2d 163, 169 (R.I. 2004)). "However, it may also 'occur even if the witness does not literally state an opinion concerning the credibility of another witness's testimony,' but rather, where 'one witness's testimony has the same substantive import as if it addressed another witness's credibility, it is inadmissible.'" Id. (quoting Arroyo, 844 A.2d at 169). Here, Dr. Goldberg did not testify one way or the other concerning the veracity or credibility of Jessica's statements; she merely testified to what she was told during the evaluation. We have held that a medical professional simply reiterating a patient's statement without passing judgment on the accuracy or

---

[10] Although at times this Court has used the terms "vouching" and "bolstering" interchangeably, the terms have separate, distinct meanings. See State v. Rushlow, 32 A.3d 892, 900 n.7 (R.I. 2011). By way of clarification, "[i]mpermissible bolstering typically occurs when one witness offers an opinion 'concerning the truthfulness of the testimony of another witness * * * ,'" State v. Hazard, 797 A.2d 448, 470 (R.I. 2002) (quoting State v. Brown, 709 A.2d 465, 479 (R.I. 1998)); whereas, "[v]ouching occurs when the government says or insinuates that it has special knowledge that its witness is testifying truthfully." Id. (quoting State v. Chakouian, 537 A.2d 409, 412 (R.I. 1988)). Because defendant's contentions concern testimony by a doctor as opposed to a government actor, the correct term in the instant case is bolstering, and thus we shall use that term.

credibility thereof does not constitute improper bolstering. See id. at 477; Lynch, 854 A.2d at 1033.

Further, we cannot agree with defendant's contention that Dr. Goldberg's testimony that she referred Jessica for follow-up treatment "effectively rubber-stamped" Jessica's testimony. In the past, we have held that the testimony of a sexual abuse counselor who made repeated references to "sexual abuse recovery" while testifying to statements made by the victim during treatment, constituted improper bolstering. State v. Haslam, 663 A.2d 902, 906 (R.I. 1995). We reasoned that, because the counselor had no firsthand knowledge of the alleged sexual assaults and based her opinion solely on what she was told during treatment, her testimony "would be perceived by the jury as a conclusive opinion that [the victim] had testified truthfully." Id. However, in Lynch, we held that a school psychologist's testimony regarding statements made during treatment of an alleged sexual assault victim did not rise to the level of impermissible bolstering that was present in Haslam. Lynch, 854 A.2d at 1033. Because the psychologist was only identified generally as a school psychologist, there was no reference to "'sexual abuse' counseling", she offered no opinion of the victim's truth or credibility, and the victim herself testified to the events that took place, "the jury could not reasonably construe [the psychologist's] testimony as vouching for the credibility of [the victim]." Id.

Here, Dr. Goldberg did not mention sexual assault treatment or counseling; she simply testified that she referred Jessica for "some follow-up treatment." Furthermore, the jury had the opportunity to judge Jessica's credibility firsthand when she herself testified to the allegations, thereby effectively eliminating whatever meager bolstering effect Dr. Goldberg's testimony may have had. We are satisfied, therefore, that the admission of Dr. Goldberg's testimony did not constitute improper bolstering.

**C**

**Motion for a New Trial**

Lastly, defendant contends that the trial justice erred in denying his motion for a new trial because he overlooked and misconstrued relevant, material evidence and that the verdicts in the case failed to do substantial justice. The defendant asserts two specific grounds to support these contentions. First, defendant argues that the trial justice overlooked evidence tending to show that the sexual relationship between him and Jessica was not the product of force or coercion; he specifically refers to an exhibit admitted at trial depicting a Garfield[11] cartoon drawn by Jessica that she gave to defendant that read "To [defendant], From [Jessica] No Taco [Last Name]." Although Jessica testified at trial that "taco" was defendant's word for her vagina and that the drawing was her way of telling defendant that she wanted the sexual contact to stop, defendant nevertheless avers that "the playful, teasing nature of the drawing dispels any notion that [Jessica] was controlled or manipulated by [defendant]."

Second, defendant argues that the trial justice misconceived an additional piece of evidence: a note written by Jessica indicating the sexual acts that she would submit to in order to be able to go back to school. The defendant contends that the list indicates that their relationship was "a two-sided sexual game" and that it "undermined the state's theory with respect to psychological coercion."

**1. Standard of Review**

"When deciding a motion for a new trial, the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." Clay, 79 A.3d at 841 (quoting State v. LaPierre, 57 A.3d 305, 310 (R.I. 2012)). In so deciding, "the trial justice must consider the evidence in light of the jury charge, then

---

[11] Garfield is the eponymous cat of the long-running, syndicated comic strip.

independently assess the credibility of the witnesses and the weight of the evidence, and also ultimately determine whether he or she would have reached a result different from that reached by the jury." Id. at 841-42 (quoting LaPierre, 57 A.3d at 310). "If, after conducting this independent review, the trial justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." Id. at 842 (quoting LaPierre, 57 A.3d at 310). "Only when the trial justice does not agree with the jury's verdict, [must he or she] embark on a fourth analytical step." Id. (quoting LaPierre, 57 A.3d at 310).

"Because a trial justice, when deciding a motion for a new trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses, on appeal, this Court's review is deferential." Clay, 79 A.3d at 842 (quoting LaPierre, 57 A.3d at 310). "If the trial justice has articulated adequate grounds for denying the motion, his or her decision is entitled to great weight and will not be overturned by this Court unless he or she has overlooked or misconceived material evidence or was otherwise clearly wrong." Id. (quoting LaPierre, 57 A.3d at 310).

### 2. Discussion

After a thorough review of the record and exhibits in this case, as well as the parties' written and oral submissions, it is clear to us that the trial justice did not err in denying defendant's motion for a new trial. The trial justice correctly articulated the standard by which he would consider defendant's motion and then embarked on an independent review of the evidence adduced at trial in light of the charges against defendant. He then recounted the testimony of the six trial witnesses, as well as the content of defendant's recorded statement.

Upon reviewing the evidence before him, the trial justice concluded "that the verdict returned by the jury was correct and amply supported by credible evidence." The trial justice was persuaded by Jessica's testimony, in which "[s]he described a series of sexual assaults over a substantial period of time with clarity." The trial justice was particularly impressed with the manner in which she testified, characterizing her testimony as "candid and forthright." He accepted her testimony, finding that "[i]t is clear the defendant employed various forms of psychological coercion and control over [Jessica] throughout the period of these sexual assaults."

The trial justice also considered defendant's statement to the police, in which he "confirmed and corroborated many of the descriptive details provided by [Jessica]." Although he acknowledged that corroboration is unnecessary to a determination of guilt, he nevertheless found that "defendant's voluntary statements bolster the accuracy and the veracity of [Jessica's] version of the events she described." He thereafter concluded "that the evidence clearly supports the defendant's guilt beyond a reasonable doubt on all ten counts for first and second degree sexual assault."

With respect to the Garfield drawing and the list of sexual acts, it is clear to us that, contrary to the defendant's contention, the trial justice did not overlook or misconceive this evidence in denying the motion for a new trial. Although the trial justice did not elaborate on the perceived significance of either of these pieces of evidence, given the context of the whole trial—which consisted of numerous corroborated accounts of a long history of sexual abuse—we cannot agree that this failure to fully elaborate constitutes overlooking or misconceiving evidence. Because the trial justice articulated adequate grounds for denying the defendant's motion for a new trial, and was not clearly erroneous in doing so, we will not disturb his decision on appeal.

## III

## Conclusion

For the reasons set forth in this opinion, the judgment of the Superior Court is affirmed, and the record of the case shall be returned to the Superior Court.



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## *Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**    State v. Roger Watkins.

**CASE NO:**    No. 2012-326-C.A.
(P1/10-3568A)

**COURT:**    Supreme Court

**DATE OPINION FILED:**  June 13, 2014

**JUSTICES:**    Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**    Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT**:

    Associate Justice Daniel A. Procaccini

**ATTORNEYS ON APPEAL:**

    For State:  Virginia M. McGinn
           Department of Attorney General

    For Defendant:  Kara J. Maguire
           Office of the Public Defender