June 30, 2023

**Supreme Court**

No. 2021-216-C.A.
(P1/17-1457A)

(Concurrence begins on
Page 33)

|  |  |
|---|---|
| State | : |
| v. | : |
| James White. | : |

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email   opinionanalyst@courts.ri.gov,   of   any typographical  or  other  formal  errors  in  order  that corrections may be made before the opinion is published.

|   |   |
|---|---|
| State | : |
| v. | : |
| James White. | : |

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Justice Robinson, for the Court.**  The defendant, James White, appeals from a December 11, 2020 judgment of conviction and commitment on one count of first-degree sexual assault entered following a jury trial.  On appeal, the defendant contends that the trial justice committed prejudicial error by permitting the state to introduce into evidence a nurse's testimony concerning what the complaining witness told her about the alleged sexual assault.

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

# I

## Facts and Travel

On June 5, 2017, defendant was charged by indictment with one count of first-degree sexual assault in violation of G.L. 1956 §§ 11-37-2 and 11-37-3, stemming from an alleged sexual assault against Iliana Gomez on December 4, 2016.[1] A jury trial commenced on November 6, 2019, and it continued on November 7 and 8, with a guilty verdict being returned on November 12 of that year. We relate below the salient aspects of that trial.

## A

### The Testimony of Patrolman Michael Maycock

Patrolman Michael Maycock testified that, at approximately 2:00 a.m. on December 4, 2016, he responded to a call from a neighbor of defendant who had reported a disturbance. Officer Maycock testified that, when he arrived at the apartment where defendant lived, he "heard some screaming and yelling." He explained that what mainly "stood out" to him was that he "heard a female voice for somebody yelling to get off of her." He testified that the exact words that the female voice was yelling were: "Get the f*** off of me."

---

[1]   We shall hereinafter usually refer to the complaining witness, Iliana Gomez, and her sister, Cynthia Gomez, by their first names. We do so for the sake of simplicity, and we intend no disrespect.

Officer Maycock testified that he and another officer began to knock aggressively on the door so as to "announce [their] presence as police." He further testified that he heard the lock unlock and that he was able to push his way through the door at that point, even though there had been "a force holding the door." Officer Maycock testified that, when he entered the apartment, defendant "was naked from the waist down" and that his "genitalia was erect." He said that defendant stated that "he didn't do anything wrong" and that he "was just trying to have sex with [Iliana]."

Officer Maycock further testified that, when he first came through the door, Iliana "was curled up in a ball * * * on the floor;" he added that "she was also naked from the waist down." He testified that Iliana "was very upset, tearful, shaking" and that "[t]he only thing she said to [him] is that she just wanted to go home." Officer Maycock added that, during "[t]he whole time that [he] dealt with her, she was visibly upset and crying the majority of the time."

**B**

**The Testimony of Sergeant John Martin**

Sergeant John Martin of the Providence Police Department testified that, at approximately 2:00 a.m. on December 4, 2016, he responded to a dispatch call involving a neighbor "reporting some type of disturbance in an apartment with a

female yelling."[2] He testified that, as he was walking in, another police officer was walking out with Iliana and that, as Iliana "was walking past [him,] she was crying, visibly shaken and upset, and made a statement that she just wanted to go home." Sergeant Martin added that he went into the stairwell to meet with Officer Maycock and defendant and that defendant told him that he had been "horny and [that] he tried to have sex with her but that they didn't have sex."

## C

## The Testimony of Iliana

The complaining witness, Iliana Gomez, testified that, on Saturday, December 3, 2016, she and her sisters (Cynthia Gomez and Angelica Castro) as well as Cynthia's fiancé, defendant James White, went to Passions, a club in Providence. She further testified that, in the early morning hours of Sunday, December 4, a friend of Cynthia's agreed to pick up the three sisters at Passions. Iliana added that the friend "started giving attitude and running her mouth because she didn't want to have to drive around dropping people off." She stated that the friend then brought her back to Passions, but Passions would not allow her to re-enter because it was about to close. Iliana testified that, after the friend declined to provide her with a further ride, Cynthia told her to "wait for [defendant] to leave the club and catch a ride with him * * *."

---

[2]    At the time of the incident at issue, Sgt. Martin held the rank of patrolman.

It was Iliana's further testimony that, shortly thereafter, she saw defendant outside of Passions and he agreed to give her a ride back to the apartment in Providence which he and Cynthia shared. Iliana added that, when she arrived at the apartment, she was feeling dizzy and that she therefore lay down on an air mattress in the living room. She stated that defendant then told her "to just lie down on [Cynthia's] bed with him because she wouldn't be home until the morning." Iliana testified that she declined defendant's suggestion and told him that she "was going to stay on the air mattress."

Iliana further testified that defendant then "got on top of [her], started kissing [her] and biting [her] neck." Iliana stated that she was on her back while defendant's whole body was on top of her. She further testified that she told him "to stop it [and] to get off of [her];" she added that, when he did not comply, she began screaming for help. She said that she "kept pushing him" and "kept screaming" while he was "covering [her] mouth and choking [her]." Iliana added that defendant pulled her jeans and underwear "down to [her] thighs" and that "[h]e kept trying to put his face down there." She testified that, although she "kept pushing him," he nevertheless, "put his fingers inside of [her]." Iliana stated that she "kept fighting him" and kept screaming: "Help. Get off me."

Iliana added that, when defendant removed his fingers, she started throwing up. She testified that defendant again put his fingers inside of her and then "pulled

[her] pants all the way off." Iliana also stated that she "kept kicking and pushing him, hitting him" and that she "was yelling throughout this whole * * * situation." She further testified that, every time she tried to separate herself from defendant, he would pull her by her hair and would push her back down.

Iliana next testified that she told defendant that she would "do what he wants [her] to do" but that first she "just need[ed] to use the bathroom real quick." She stated that it was her intention "to run to the door." Iliana said that defendant did let her use the bathroom, but that he stood "[i]n the bathroom door." Iliana testified that she ran for the door on her way out of the bathroom, while defendant kept pulling her hair as she continued screaming for help. She further testified that defendant kept covering her mouth and continued to bite her.

Iliana testified that, after a couple of minutes, she was able to unlock the apartment door that led to the outside common hallway. She added that defendant pinned her down and that she was slouched in the corner, with her knees up to her chest, while defendant proceeded to pull her head back in an attempt to force his penis into her mouth. It was also her testimony that she tried to push him off and that she kept shoving him when she heard a loud knock at the door. Iliana stated that, as the police walked in, defendant was screaming: "Just tell them we just got into an argument." Iliana testified that she told the police that "it was just an argument" because she "was scared" and "just wanted to go home." She stated

- 6 -

that an officer drove her to the police station, where she called her mother to request that she be picked up.

Iliana testified that, after returning home, she tried to lie down, but "was in a lot of pain." She further testified that her "head really hurt" and that she therefore took a shower; she added that, when she got out of the shower, she continued throwing up. She stated that she told her mother and her aunt about what had happened in the apartment with defendant and that they then "took [her] to the hospital."

In the course of Iliana's testimony, various communications from defendant were introduced into evidence; those communications all occurred subsequent to the sexual assault that allegedly occurred in the early morning hours of December 4, 2016. In the following paragraphs, we summarize those communications.

### 1. The Defendant's Direct Communications with Iliana

Iliana testified that, in the afternoon or early evening of December 4, she received two Facebook Messenger[3] messages from defendant, screen shots of which were admitted as full exhibits at trial.

---

[3] Meta Platforms, Inc., which is the owner of both Facebook and Messenger, describes Messenger as "a simple yet powerful messaging application for people to connect with friends, family, communities, and businesses across platforms and devices through text, audio and video calls." Meta Platforms, Inc., Annual Report (Form 10-K) 7 (Feb. 2, 2023).

The first message was sent at 2:34 p.m. on December 4 to Iliana, who testified that her nickname is "Ellie." The message reads as follows:

> "Hey Ellie I just wanna say I am so so sorry [I don't know] what I was thinking I was jus drunk & I wasn't myself but please Ellie don't say anything to anyone about this please I am sorry & I'll do anything to show u how sorry I am I love u kid please don't say anything I told Cynthia that the cops didn't come to the House & that u left cuz me & u got into a argument please Ellie keep this between us I love you & I am sorry I jus can't lose my family over a drunk night I love u & I am sorry after you read this delete the message."

The second message, which defendant sent to Iliana approximately four hours later at 6:36 p.m., reads as follows:

> "Can you please tell your sister the truth please because someone told her I tried to rape u & I know it wasn't u that said that cuz that never happen & u know that we both as jus mad f***ed up smh."[4]

Iliana testified that the next day she went to the police to report the alleged sexual assault.

Iliana further testified that defendant sent her a third Facebook Messenger message several days later, on December 12, 2016; that message reads as follows:

> "Cynthia jus told me that u called her & said that the cops is about to pick me up so I guess your ready to get locked up to IDC."[5]

---

[4] Iliana testified that she understands "smh" to mean "[s]haking my head."

[5] Iliana testified that she understands "IDC" to mean "I don't care."

It was Iliana's testimony at trial that she did not respond to any of these messages from defendant.

Iliana further testified that at some point in time there was a "three-way" call that was meant to involve defendant and Cynthia and Iliana herself. She further testified, however, that she ended the call as soon as she heard defendant say: "Just hear me out."

## 2. The Affidavit

Iliana testified that, at a later date,[6] while they were in a car together, Cynthia provided her with an affidavit that she said defendant had prepared for her to sign, which she did. The affidavit, which was admitted as a full exhibit, stated:

> "To whom it may concern,
>
> "I Iliana Gomez is writing this affidavit to recant my statement and be honest and say I lied and that my whole testimony was made up. I never liked James White. I always hated him but he is not guilty of anything but being disloyal to my sister. At one point, he did hold me down that's why I was screaming get off me but that's only because I was trying to hit him and he was trying to stop me, but again he not guilty of anything but being disloyal to my sister.
>
> "Thank you!!!"

---

[6] Iliana testified that she did not know the exact date on which she signed the affidavit.

Iliana testified at trial that the information contained in the affidavit was not true. She further testified that she signed the affidavit because at that time she was "heavily drinking" and was "pressured" and "overwhelmed."

### 3. The Defendant's Telephone Call to Cynthia Shortly before the Trial

On November 2, 2019, four days prior to trial, defendant called Cynthia from prison.[7] A recording of the call was admitted as a full exhibit at trial. In the course of that call, defendant stated:

> "[M]y brother and his wife asked the lawyer well um what if uh what if uh home girl don't show up, and he said well if home girl don't show up then he's walking the f*** outta here. It's no questions… it's no questions asked, he's walking the f*** outta here. And the lawyer said but that's not the case this girl is showing up, um and my brother said well how could you be so sure * * *. And it's crazy cause my lawyer begged me not to say something, but it's like how do I not say nothing when I find out that they're still tryna come to court and take my life away from me. When ain't nobody gonna get in trouble if no…don't nobody show up. You know what I'm saying?"

Later in the same telephone call, defendant spoke to Cynthia as follows:

---

7    The jury was not made aware that defendant's call to Cynthia was made from prison. The trial justice instructed the jury in that regard as follows:

> "[T]his is a phone call that was recorded. What I do want you to know is, number one, you're not to speculate as to the location of the caller or the person who received the call and spoke to the caller.
>     Number two, you are to know that the recording of this call was done legally and permissibly, so don't speculate about that either."

- 10 -

"But I do want you to know that no matter what they tell you, if they do tell you anything, if they don't tell you anything, I want you to know because your daughter …our daughter, you know what I'm saying, will have her father back next week if they don't show up to court. But if they do, * * * I'm not coming home next week * * *."

Still later in the telephone call, he said to Cynthia:

"I just wish like hell you can just block everything out your mind for one day, just one f***ing day, one day, and just take into consideration that it's a possibility that they would listen to you, and if they don't then they don't. You know what I'm saying, but at least honestly God forbid my shit went left you can say well look I tried to get them not to show up, that's it."

After a voice on the recording device indicated that there was one minute remaining on the call, defendant said:

"Cynthia, * * * if it's the last f***ing thing I ever ask for yo all jokes aside, at least try. Try to talk to these people and tell them please do not show up."

## D

### The Testimony of Nurse Katherine Plante

On the second day of trial, November 7, 2019, Katherine Plante, a registered nurse employed by Kent County Hospital, testified as to her interactions with Iliana in the late afternoon of December 4, 2016. Nurse Plante's testimony provided in pertinent part as follows:

"[PROSECUTOR]: The sex assault exam, could you describe it for the jury? What do you do initially upon encountering a patient as a resource nurse?

- 11 -

"[NURSE]: You will go in a room and there's a box that you get. It's chain of custody. So you open it up and there's policy and protocols that you go through, and there's paper that you take out. The person needs to change, and there's a lot of documentation that you go through and --

"* * *

"[PROSECUTOR]: During this exam, do you speak with the patient?

"[NURSE]: Yes.

"[PROSECUTOR]: What is the point of speaking with the patient?

"[NURSE]: To get what they're saying happened[,] to understand what they're saying. Then to also offer support after.

"* * *

"[PROSECUTOR]: When you first encountered [Iliana], what did you do?

"[NURSE]: At first I introduced myself, spoke with her, and just explained that it was going to be a lengthy procedure what we were doing. I explained to her what would happen, and that the information she gave me would not leave with me until it's locked up and secured.

"[PROSECUTOR]: So did you speak with her? Did you have a conversation with her?

"[NURSE]: Yes.

"[PROSECUTOR]: Describe her appearance, her demeanor, during this initial conversation.

"[NURSE]: She was very anxious, shaking, disheveled. She really didn't -- she would answer my questions, but didn't elaborate a lot. It just seemed like she kind of wanted to get in and out.

"[PROSECUTOR]: Did you ask her what happened?

"[NURSE]: Yes.

"[PROSECUTOR]: What did she tell you?

"[NURSE]: She had said that she had gone out with her sisters, her sister's boyfriend and her sister's boyfriend's friends. And at some point she went back to, I believe it was her sister's apartment, yes, her sister's apartment, that she was alone with James White. She had said that --"

Defense counsel then objected and requested to be heard at sidebar, where the following exchange occurred:

"THE COURT: What is your ground?

"[DEFENSE COUNSEL]: My ground is hearsay, Your Honor. This is supposed to be -- the information being provided by the patient, it's supposed to be for purposes of medical diagnosis and treatment and identifying a perpetrator, no connection to medical --

"THE COURT: I'm actually on cases where potentially it could be someone close to you. For the protection of the patient, sometimes they want the identity. In other words, was it a stranger, an assault, all right? You might not need the person identified with particularity because

- 13 -

that's not pertinent; whereas, if it is a family member or someone close to a family member, it may be pertinent.

But what do you say?

"[PROSECUTOR]: Your Honor, I would suggest, for that exact reason, this is a situation where the witness is examining the complainant who is already disheveled, anxious, nervous. Certainly --

"THE COURT: Is this part of the appropriate hearsay exception for medical treatment history?

"[PROSECUTOR]: Yes.

"THE COURT: Yes?

"[PROSECUTOR]: Particularly in getting the patient's history, the nurse wants to discover what kind of risk that she has."

At that point, the trial justice overruled defense counsel's objection, and the prosecutor continued with the direct examination of Nurse Plante.

"[PROSECUTOR]: What else did [Iliana] tell you?

"[NURSE]: She said that she didn't feel well and that she was told to go lie down on the air mattress that was on the floor, and she said that she was pushed down on the mattress, that the assault was that he used his fingers inside of her vagina, pulled her clothes down and that at some point he tried to put his penis in her mouth and that she was screaming. At some point she was bitten and her hair had been pulled.

"* * *

"[PROSECUTOR]: In addition to her injuries, did [Iliana] talk about any physical reaction she had to being assaulted?

- 14 -

> "[NURSE]: She claimed to just feel very sick, nauseous and had been vomiting, she said, all day."

The trial then adjourned for the day.

## E

## The Conclusion of the Trial

Nurse Plante's testimony continued the next day, November 8, 2019, with her explaining the photographs that she had taken of Iliana's body, including a bite mark on Iliana's neck and bruising on her forearm, knees, wrist, elbow, chest, shoulder blades, feet, and neck.[8]

After presenting the testimony of a witness from the Rhode Island Department of Health that is of no relevance to the issues before us, the state rested.[9] The defendant chose not to testify and presented no witnesses. Counsel then delivered their closing arguments, and the jury was instructed by the trial justice before retiring to deliberate.

---

[8] The photographs about which Nurse Plante testified were admitted as full exhibits.

[9] After the state rested, defendant moved for a judgment of acquittal pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure. That motion was denied by the trial justice.

**The Verdict and the Sentence**

On November 12, 2019, the jury returned a guilty verdict. On November 16, 2020, the trial justice sentenced defendant to thirty-eight years at the Adult Correctional Institutions, with twenty-three years to serve and fifteen years suspended, with probation. The defendant filed a timely notice of appeal.

**II**

**The Issue on Appeal**

The issue before this Court is whether the trial justice committed prejudicial error by permitting the state to introduce into evidence Nurse Plante's testimony relative to what Iliana related to her about the alleged sexual assault. The focus of our analysis will be on Rule 803(4) of the Rhode Island Rules of Evidence, entitled "Statements for Purposes of Medical Diagnosis or Treatment." Rule 803(4) describes as follows certain medically related statements that are not barred pursuant to the general rule that makes hearsay statements inadmissible:

> "Statements *made for purposes of medical diagnosis or treatment* and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment, but not including statements made to a physician consulted solely for the purposes of preparing for litigation or obtaining testimony for trial." (Emphasis added.)

## III

## Standard of Review

It is a basic principle that the "determination of whether an out-of-court statement meets an exception to the hearsay rule is within the trial justice's discretion." *State v. Martin*, 68 A.3d 467, 475 (R.I. 2013) (quoting *Rhode Island Managed Eye Care, Inc. v. Blue Cross & Blue Shield of Rhode Island*, 996 A.2d 684, 692 (R.I. 2010)). When this Court applies this standard, "a trial justice's ruling will be upheld unless abuse of discretion that prejudices the complaining party is shown." *State v. Brown*, 9 A.3d 1240, 1247 (R.I. 2010); *see also State v. Bergevine*, 942 A.2d 974, 978 (R.I. 2008) ("[T]he admission of a statement under an exception to the hearsay rule is within the sound discretion of the trial justice and shall not be overturned unless clearly erroneous.") (quoting *State v. Ruffner*, 911 A.2d 680, 689 (R.I. 2006)).[10]

## IV

## Analysis

The defendant contends that the trial justice committed prejudicial error by allowing the state to introduce into evidence Nurse Plante's testimony concerning what Iliana related to her about the alleged sexual assault. Specifically, defendant

---

[10] We have further explained that a "trial justice will not have abused his or her discretion as long as some grounds supporting his or her decision appear in the record." *State v. Evans*, 742 A.2d 715, 719 (R.I. 1999); *see also State v. Nichols*, 155 A.3d 1180, 1186 (R.I. 2017); *State v. Brown*, 88 A.3d 1101, 1116 (R.I. 2014).

argues that the state did not provide a proper foundation to establish that the statements by Iliana to Nurse Plante were made for the purpose of medical diagnosis or treatment pursuant to Rule 803(4). The defendant further contends that, even if there had been a proper foundation, certain portions of Nurse Plante's testimony assigned fault and narrated details, including defendant's name, which portions were not connected with Iliana's treatment and, therefore, were not admissible under Rule 803(4).

For its part, the state argues that "issues other than [Nurse Plante's] mentioning defendant's name have been waived and are not properly before this Court for review." As for the mentioning of defendant's name, the state notes that "identity was not a disputed issue in this case." The state also argues that, "apart from the identity issue, the nurse's testimony was cumulative as Iliana testified with specificity and was cross-examined at length regarding the events of that evening." In the same vein, the state contends that if "any aspect of [Nurse Plante's] testimony was erroneously admitted, it was harmless beyond a reasonable doubt considering the overwhelming evidence of defendant's guilt."

## A

### The State's Waiver Argument

With respect to its contention that issues other than Nurse Plante's mentioning defendant's name have been waived, the state argues that "[a]lthough

defendant did initially mention hearsay as the basis of his objection, during the ensuing side bar, he focused the trial justice's attention to the specific reason for his hearsay objection – arguing that 'identifying a perpetrator' had no connection to medical diagnosis and treatment." On that basis, the state contends that all issues except the one involving the naming of defendant as the perpetrator are not properly before this Court because defendant "never argued that other details allegedly unrelated to medical diagnosis and treatment * * * were improperly admitted or that an improper foundation was established to introduce any patient history as he now argues on appeal * * *." By contrast, it is defendant's position that his objection "was specific enough to focus the trial justice in on the hearsay issues—the same hearsay issue [he] now asserts on appeal."

This Court has "repeatedly indicated that it adheres to what is commonly called the 'raise or waive' rule—*i.e.*, we do not consider issues on appeal which were not raised and properly presented during proceedings in the court below." *DeMarco v. Travelers Insurance Company*, 26 A.3d 585, 628 (R.I. 2011); *see also State v. Figuereo*, 31 A.3d 1283, 1289 (R.I. 2011) ("It is well-settled that this Court will not review issues that were not presented to the trial court in such a posture as to alert the trial justice to the question being raised.") (internal quotation marks omitted); *State v. Moreno*, 996 A.2d 673, 684 (R.I. 2010). In our opinion,

defendant in this case sufficiently complied with the strictures of the "raise or waive" rule.

The trial transcript reflects that defendant clearly objected on the ground of hearsay.[11] And, significantly, he added that "the information being provided by the patient [is] supposed to be for purposes of medical diagnosis and treatment * * *." He also noted that "identifying a perpetrator [has] no connection to medical * * *." Therefore, although defendant did not, in so many words, argue that the state had not established a sufficient foundation for the introduction of Iliana's statements to Nurse Plante, we are more than satisfied that, in the context of this case, defendant's objection was sufficiently focused so as to "alert the trial justice to the question being raised" and to allow her to evaluate the objection on that basis. *Figuereo*, 31 A.3d at 1289 (quoting *Pollard v. Acer Group*, 870 A.2d 429, 433 (R.I. 2005)). The defendant's appeal primarily focuses on whether Nurse Plante's testimony, which paraphrased statements made to her by Iliana on the day of the alleged sexual assault detailing what had happened to her, fell within the Rule

---

[11] When defense counsel interposed an objection during the testimony of Nurse Plante, the trial justice asked: "What is your ground?" Defense counsel's response in its entirety was as follows:

> "[DEFENSE COUNSEL]: My ground is hearsay, Your Honor. This is supposed to be -- the information being provided by the patient, it's supposed to be for purposes of medical diagnosis and treatment and identifying a perpetrator, no connection to medical --"

803(4) exception to the hearsay rule; and it is clear to us that this issue was sufficiently referenced in defendant's objection. Accordingly, we are of the opinion that defendant's arguments on appeal relative to Rule 803(4) were not waived and are properly before this Court.

**B**

**Nurse Plante's Testimony and Rule 803(4)**

**1. The Foundation for Nurse Plante's Testimony**

We next must determine whether the state provided an adequate foundation to establish that Iliana's statements as testified to by Nurse Plante were properly admitted into evidence as an exception to the hearsay rule pursuant to Rule 803(4).

In making this determination we are mindful of the following statement from a previous case: "[T]he simple fact that a statement *could* be helpful in diagnosis is not in itself sufficient for admission under Rule 803(4); there must be a proper foundation establishing that the challenged statements were in fact made *for the purpose of treatment or diagnosis*." *State v. Watkins*, 92 A.3d 172, 188 (R.I. 2014) (first emphasis in original; second emphasis added). After carefully reviewing the record in the instant case, it is our opinion that the statements of Iliana that were

relayed by Nurse Plante "were in fact made *for the purpose* of treatment or diagnosis." *Id.* (emphasis added).[12]

We begin by directing attention to the crystalline language of the Rule. In pertinent part, Rule 803(4) makes admissible the following:

> "Statements made for purposes of medical diagnosis or treatment and describing * * * past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment * * *."

It is important to note that the focus of the just-quoted language is on *the purpose* for which a person consults with someone deemed to be capable of providing medical diagnosis or treatment. *See State v. Lynch*, 854 A.2d 1022, 1031 (R.I.

---

[12]   The contrast between the facts in *State v. Watkins*, 92 A.3d 172 (R.I. 2014), and those in the present case is striking. The defendant in that case had been arrested on or about February 23, 2010, but it was not until March 3 that Amy Goldberg, M.D., performed her examination of the complaining witness (pseudonymed "Jessica"). *Watkins*, 92 A.3d at 177-78. Doctor Goldberg is identified in the *Watkins* opinion as "a pediatrician at Hasbro Children's Hospital and the supervisor of the Child Protection Program, a program that evaluates children who are potential victims of maltreatment." *Id.* at 178. It was during that examination that "Jessica recounted a lengthy history of sexual abuse at the hands of [the defendant in that case]." *Id.* Significantly, this Court in *Watkins* went out of its way to note that Dr. Goldberg "did not specifically testify that the statements Jessica made about her mounting fear of [the defendant in that case] or those regarding the exchange of sex for school attendance were made for the purpose of diagnosis or treatment." *Id.* at 188.

By contrast, in the present case, Iliana chose to go to Kent County Hospital on the same day that the sexual assault had allegedly occurred; and on that same day, she described to Nurse Plante what had happened. Also, Nurse Plante's testimony makes it clear that she was alert to the possible need for diagnosis or treatment of Iliana's complaints as well as the need to fulfill her forensic role.

2004) ("A declarant's motive in making the statement must be consistent with seeking diagnosis or treatment.").  We have commented that "[t]he rationale behind [the Rule 803(4)] exception is that 'a person will presumably be truthful to a physician from whom he expects to receive medical attention.'" *State v. Benitez*, 266 A.3d 1221, 1227 (R.I. 2022) (quoting *State v. Pina*, 455 A.2d 313, 315 (R.I. 1983)).

It is clear to us, having carefully reviewed the record in its vital context, that Nurse Plante's testimony falls within the parameters of Rule 803(4).  The record reveals that, before ever going to the police station to file charges, Iliana chose to go to Kent County Hospital, being taken there by her mother and aunt on the very day of the alleged sexual assault.  Once at the hospital, she described to Nurse Plante in some detail what had allegedly happened to her.  It is a completely logical inference that Iliana did so for the purpose of obtaining whatever relief the nurse and the hospital could provide—namely such diagnosis or treatment as might be appropriate, whether it be through traditional hands-on medical intervention or the prescription of medication or intelligent and supportive counsel from a medical professional.[13]  In other words, Iliana's statements were clearly "made for purposes

---

[13]   The following exchange between Iliana and the prosecutor is noteworthy:

> "[PROSECUTOR]: Despite being uncomfortable about everything, why did you tell your aunt and your mom?

of medical diagnosis or treatment" and, therefore, are of the type referenced in Rule 803(4).[14]

It is noteworthy that Iliana went to the hospital in the company of her mother and aunt after she had been throwing up for hours and had been feeling ill. She testified that she had provided her mother and aunt with details about the alleged

---

> "[ILIANA]: Because they needed to know, and I was in a lot of pain."

For her part, Nurse Plante testified that, when called upon as a nurse to speak with a person complaining of a sexual assault, in addition to conducting a forensic exam, she also speaks with the patient for two reasons: (1) to try "to get what they're saying happened[,] to understand what they're saying" **and** (2) "to also offer support after."

[14] The case of *State v. Lynch*, 854 A.2d 1022 (R.I. 2004), is radically distinguishable from the instant case. In the course of holding that the statements to the certified school psychologist by the alleged victim (pseudonymed "Mary") should not have been admitted, this Court in *Lynch* wrote as follows:

> "There must * * * be a proper foundation showing that the statements in question were made for the purposes of medical diagnosis or treatment. Here, Mary did not seek out the psychologist for a diagnosis or treatment of her problems; rather, the psychologist sought out Mary. * * * [T]here was no showing that Mary's purpose in making the statements was for diagnosis or treatment from [the psychologist] * * *." *Lynch*, 854 A.2d at 1031-32 (internal quotation marks omitted).

By contrast, in the instant case, the record is clear that Iliana went to the hospital of her own volition and that she did so even before going to law enforcement. Her purpose in doing so was to obtain medical attention relative to the fact that she was "in a lot of pain," had been vomiting, and "had bruises all over."

sexual assault and the fact that she was "in a lot of pain" and "had bruises all over" and that they then "took [her] to the hospital." She further testified that at the hospital she told Nurse Plante that she had been vomiting, and she described the pain that she was feeling at the time.

We are unpersuaded by defendant's contention that the statements at issue "centered on reporting a crime, not treating a medical condition * * *." Iliana was brought to the hospital by her mother and her aunt after she had explained to them that she had been sexually assaulted *and* that she was "in a lot of pain." Significantly, at that point in time, Iliana had not reported the alleged sexual assault to the police. Nurse Plante testified that, upon their first meeting, Iliana "was very anxious, shaking, [and] disheveled." She explained that Iliana "would answer [her] questions, but didn't elaborate a lot," opining that "[i]t just seemed like she kind of wanted to get in and out." Furthermore, in addition to describing the alleged sexual assault, Iliana complained to Nurse Plante that "her neck and back were hurting her," and she also "claimed to just feel very sick, nauseous and had been vomiting, she said, all day."

It is clear to us from our review of the record that Nurse Plante was, in effect, wearing two hats when she met with Iliana. While Nurse Plante was undeniably collecting potential evidence in accordance with her forensic role, the record additionally reflects that she was also paying attention to the medical

- 25 -

symptoms and concerns being disclosed to her by Iliana—who, it must be emphasized, had opted to come to the hospital very soon after the alleged assault.[15] *See United States v. Gonzalez*, 533 F.3d 1057, 1062 (9th Cir. 2008) (noting that the "forensic function" performed by the nurse in that case "did not obliterate her role as a nurse, in a hospital"). *See generally State v. Tsosie*, 516 P.3d 1116 (N.M. 2022).

We are satisfied that the vast majority of statements which Iliana provided to Nurse Plante during their colloquy were pertinent to Nurse Plante's professional consideration of potential diagnosis or treatment options for Iliana because those statements provided relevant background information as to the cause of Iliana's pain and other physical complaints, including her distressed mental state. *See Benitez*, 266 A.3d at 1229 (holding that there was "no reversible error in the trial justice's determination that the statements at issue were 'inextricably intertwined' with [the doctor's] examination and with her need to obtain all the reasonably pertinent information needed to treat [the complaining witness]"); *see also United States v. Gabe*, 237 F.3d 954, 957-58 (8th Cir. 2001) ("In general, a patient's

---

[15] A hospital is by definition a place where a person "in a lot of pain" would go to seek medical diagnosis or treatment. The American Heritage Dictionary defines "hospital" as "[a] facility that provides emergency, inpatient, and usually outpatient medical care for sick or injured people." The American Heritage Dictionary of the English Language 850 (5th ed. 2011).

statement describing how an injury occurred is pertinent to a physician's diagnosis and treatment * * *.").

It is true that Nurse Plante did testify as to what Iliana said about what defendant refers to as "the details of the alleged assault." The point is, however, that the bulk of those "details" were pertinent to the nurse's role of providing diagnosis and treatment. For example, such details as Iliana's statements to the nurse that the alleged assailant "used his fingers inside of her vagina" and that "[a]t some point she was bitten and her hair had been pulled" are instances of information that clearly would assist the nurse in assessing the patient's overall status (both physical and emotional) so that she could properly carry out her diagnostic and treatment role to provide patient-centered care. Moreover, even less obviously relevant details (like the allegation that Iliana was pushed down on a mattress or had her pants pulled down) were part and parcel of the explanation that Iliana was providing to the nurse as to why she was experiencing physical pain and was in such an emotionally agitated state.[16]

We have meticulously scrutinized the record in this case, taking into account defendant's well-articulated legal arguments. In the end, however, we have concluded that (with the exception of the assigning of fault issue discussed *infra*)

---

[16] It is important to bear in mind that Nurse Plante was confronted with a patient who was clearly in an unsettled emotional state in addition to the fact that she presented with perceptible physical issues. Unquestionably, part of the nurse's role in such a situation was to deal with the patient's emotional state.

the trial justice acted within her discretion in admitting the testimony of Nurse Plante. *See State v. Merida*, 960 A.2d 228, 234 (R.I. 2008) ("[Q]uestions as to the admissibility *vel non* of evidence are confided to the sound discretion of the trial justice, and this Court will not interfere with a trial justice's decision in that regard unless there was a clear abuse of discretion and the evidence was both prejudicial and irrelevant."). We are satisfied that the state provided a sufficient foundation to support the conclusion that Iliana articulated her statements to Nurse Plante for the purpose of medical diagnosis or treatment, even if Nurse Plante was simultaneously performing a forensic function.

## 2. Harmless Error[17]

Although we have, after careful scrutiny of the record, concluded that we should affirm the discretionary decision of the trial justice to admit Nurse Plante's testimony under Rule 803(4), we recognize that the question is close. However, we hasten to indicate that, even if we had reached a contrary conclusion and decided that the trial justice erred, we would have considered such error to constitute harmless error beyond a reasonable doubt.

The basic standard for determining whether an error is harmless has been articulated as follows: "In order to meet the harmless-error test, there must be

---

[17] In this section of this opinion, we prescind from the portion of Nurse Plante's testimony which identifies defendant by name as the person who committed the alleged sexual assault. That issue we address in the next section of this opinion.

proof 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *State v. Mercurio*, 89 A.3d 813, 822 (R.I. 2014) (quoting *State v. Smith*, 446 A.2d 1035, 1036 (R.I. 1982)).

Cumulative evidence is evidence that tends "to prove the same point to which other evidence has been offered." *Benitez*, 266 A.3d at 1229 (quoting *Lynch*, 854 A.2d at 1032); *see also Watkins*, 92 A.3d at 189. We have similarly stated that "the admission of hearsay evidence is not prejudicial when the evidence is merely cumulative and when [the] defendant's guilt is sufficiently established by proper evidence." *State v. Robinson*, 989 A.2d 965, 979 (R.I. 2010) (quoting *Lynch*, 854 A.2d at 1032); *see also Benitez*, 266 A.3d at 1229; *State v. Micheli*, 656 A.2d 980, 982 (R.I. 1995); *State v. Angell*, 122 R.I. 160, 168, 405 A.2d 10, 14 (1979). We have further indicated that "[t]he test to be applied is a retrospective one, administered at the close of all the evidence to determine whether the admission of certain evidence was harmless in light of all the evidence admitted on that point." *Benitez*, 266 A.3d at 1229 (internal quotation marks omitted); *see also State v. Johnson*, 13 A.3d 1064, 1068 (R.I. 2011) ("[T]here is an inescapable conclusion that, even if there were a question about the admissibility of [certain] testimony, * * * such testimony was merely cumulative and therefore not prejudicial to [the defendant]."); *State v. Ramirez*, 936 A.2d 1254, 1267 (R.I. 2007) ("Viewing the abundant evidence in this case that supports the jury's verdict, we are satisfied that

admitting [a particular] out-of-court statement amounts, at best, to harmless error.").

Nurse Plante's relatively brief testimony summarizing the statements that Iliana made to her was simply a condensed mirroring of Iliana's own lengthy trial testimony, which spanned 183 pages of trial transcript and was highly detailed. *See Benitez*, 266 A.3d at 1229 (noting that the testimony of the doctor in that case was "simply a repetition of [the complaining witness's] own lengthy testimony which was highly specific"). Significantly, Nurse Plante did not opine as to the veracity or credibility of Iliana's statements. *See id.* at 1229-30; *Lynch*, 854 A.2d at 1033. Furthermore, Officer Maycock testified that he found defendant "naked from the waist down" and that his "genitalia was erect." He further testified that defendant stated that "[h]e was just trying to have sex with [Iliana]." Additionally, Sgt. Martin testified that defendant also stated that he "was horny and he tried to have sex with [Iliana] but that they didn't have sex." Accordingly, because the jury had before it Iliana's own extensive testimony as well as the testimony of Officer Maycock and Sgt. Martin in addition to the photographs of Iliana's injuries, and the evidence of defendant's several inculpatory communications made subsequent to the alleged sexual assault, we are satisfied that the statements at issue were cumulative evidence, the admittance of which was harmless beyond a reasonable doubt. *See Benitez*, 266 A.3d at 1229-30.

### 3. Statements Assigning Fault to Defendant

The defendant vigorously contends that certain portions of Iliana's statements as recalled by Nurse Plante in her rendition of Iliana's statements to her were not pertinent to Iliana's medical care. Notably, defendant points to the testimony to the effect that "James White, identified by name, pushed [Iliana] on the mattress, pulled her clothing off, assaulted her by putting his fingers in her vagina, and tried to put his penis in her mouth, all while she was screaming." The defendant contends that such statements: (1) were "about assigning blame and describing Mr. White's purported wrongdoing;" and (2) "lacked indicia of reliability" because they "centered on reporting a crime, not treating a medical condition * * *."

This Court has held that "[s]tatements that narrate details unconnected with either diagnosis or treatment * * * are inadmissible unless they fall under another hearsay exception." *State v. Gaspar*, 982 A.2d 140, 151 (R.I. 2009); *see also Watkins*, 92 A.3d at 188; *In re Andrey G.*, 796 A.2d 452, 456 (R.I. 2002). Moreover, "[w]hen statements about causation enter the realm of assigning fault, it is unlikely that the patient or the physician consider them related to diagnosis or treatment." *Gaspar*, 982 A.2d at 151.

While we unhesitatingly indicated in Part IV.B.1 of this opinion that the trial justice did not abuse her discretion in admitting the great bulk of Nurse Plante's

testimony concerning the statements made to her by Iliana, we nonetheless do perceive error in her permitting Nurse Plante to include the fact that Iliana had referred to defendant by name in the course of her description of the alleged sexual assault and identified him as the perpetrator thereof. At the same time, however, it is our view that that particular error on the part of the trial justice constitutes harmless error beyond a reasonable doubt. It is our view that this evidentiary error was harmless as being "merely cumulative" in view of the fact that defendant's guilt was "sufficiently established by proper evidence." *Robinson*, 989 A.2d at 979 (quoting *Lynch*, 854 A.2d at 1032).

It is also noteworthy that the identity of defendant was not in dispute at the trial. Although defendant did not testify, defense counsel, in both his opening statement and his closing argument, sought to convince the jury that the evidence showed that there had been fighting between defendant and Iliana, but that no sexual contact had occurred. In other words, the jury was made aware from the outset that defendant was the person involved in the incident in which the alleged sexual assault occurred. And Iliana made the same accusation in her direct testimony.

For these reasons, it is our view that the fact that Nurse Plante in her testimony mentioned that Iliana had said that the alleged sexual assault was committed by the defendant was clearly harmless cumulative evidence.

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record may be returned to that tribunal.

**Chief Justice Suttell, with whom Justice Long joins, concurring.** Although I concur with the majority's ultimate conclusion affirming the judgment of the Superior Court, I part company with its analysis of the admission of Nurse Plante's testimony under Rule 803(4) of the Rhode Island Rules of Evidence as an exception to the hearsay rule for statements made for the purposes of medical diagnosis or treatment. In my judgment, the state failed to provide an adequate foundation for the admission of the statements made by Iliana to Nurse Plante.

The majority begins its analysis of the Rule 803(4) issue with pertinent language from *State v. Watkins*, 92 A.3d 172 (R.I. 2014): "[T]he simple fact that a statement *could* be helpful in diagnosis is not in itself sufficient for admission under Rule 803(4); there must be a proper foundation establishing that the challenged statements were in fact made for the purposes of treatment or diagnosis." *Watkins*, 92 A.3d at 188. The majority then goes on to enunciate the rule, and from that closer examination of the language, determines that *the purpose* for seeking care is the touchstone for a Rule 803(4) analysis—the rationale being

- 33 -

that "a person will presumably be truthful to a physician from whom he expects to receive medical attention[,]" which eradicates the unreliability that typically plagues hearsay statements. *State v. Pina*, 455 A.2d 313, 315 (R.I. 1983).

Although the patient's initial motivation for pursuing treatment is undoubtedly relevant, the flip side of that coin is "whether what has been related by the patient will assist or is helpful in the diagnosis or treatment of the patient's ailment." *State v. Gaspar*, 982 A.2d 140, 151 (R.I. 2009) (brackets omitted) (quoting *In re Andrey G.*, 796 A.2d 452, 456 (R.I. 2002)). To admit statements under the Rule 803(4) exception to the hearsay rule, the state must lay an adequate foundation to demonstrate that these justifications for admission are present in the witness's testimony. *See id.* at 153 (noting that the admissibility of statements under Rule 803(4) "undoubtedly will depend in large measure on the foundational testimony"). Otherwise, the statements should be excluded as inadmissible hearsay. Reviewing this Court's caselaw pursuant to Rule 803(4), I conclude that the foundation here was lacking.

The majority concludes that, because Iliana visited Kent County Hospital in the immediate aftermath of her alleged assault, the purpose for her visit was to receive "whatever relief the nurse and the hospital could provide[.]" The majority also emphasizes the fact that Iliana was experiencing physical pain and discomfort

- 34 -

at the time she went to the hospital and that she conveyed these symptoms to Nurse Plante.

I agree that Iliana's complaints to Nurse Plante about her pain, nausea, and vomiting indicate Iliana's perception that Nurse Plante was in a position to offer her treatment. However, the testimony shows that Nurse Plante's primary role was to assess Iliana's physical state and collect evidence to be transferred to law enforcement. The majority acknowledges that Nurse Plante was "wearing two hats[,]" but clearly her forensic hat took precedence.

By her own testimony, Nurse Plante's role as the resource nurse was to administer a "sex assault forensic exam[,]" which, she explained, involves a box to establish a chain of custody with law enforcement for the evidence—i.e., swabs, blood, urine, clothes—obtained during the exam. Nurse Plante made clear that all of the information from the exam is then routed directly to the police department. During an exam, Nurse Plante went on, she speaks with the patient to understand what happened during the incident and potentially to "offer support after." Nurse Plante clarified, however, that any "long-term care" falls outside her purview. She also stated that, although she took blood and urine samples from Iliana, the actual testing of those samples was not something she "deal[s] with[.]"

Of additional note is Nurse Plante's testimony that, when she first encountered Iliana, she explained the "lengthy procedure" that would ensue.

Specifically, Nurse Plante told Iliana that "the information [Iliana] gave [Nurse Plante] would not leave * * * until it's locked up and secured." Moreover, Nurse Plante stated that Iliana "seemed like she kind of wanted to get in and out." Overall, these statements suggest that the interaction between Nurse Plante and Iliana was somewhat transactional and that Iliana understood that the results yielded from the exam would be passed on to the police. All of this signals that the forensic aspect of the exam subsumed any general "support" Nurse Plante may have offered.

While the majority "unhesitatingly" concludes that there was no abuse of discretion in admitting much of Nurse Plante's testimony, I view this as a much closer case. Nurse Plante's multifaceted role is not something this Court should have to tease out after poring over the trial testimony. It is the prosecutor's job to lay the proper foundation for the bounds of hearsay testimony given by the state's witness. *See In re Rylee A.*, 233 A.3d 1040, 1050 (R.I. 2020) ("The proponent of the evidence must lay a proper foundation establishing that the statements in the record were made for purposes of medical diagnosis or treatment.").

In *State v. Watkins*, we held that the foundation was improperly laid because the doctor, a child-abuse specialist, did not explain how the victim's statements about her fear of her abuser factored into the doctor's treatment. *Watkins*, 92 A.3d at 188. At trial, the doctor conceded that her evaluations of the victim "[were]

more centered on the physical trauma[,]" even though her typical exams often contained a psychological component. *Id.* Nevertheless, this Court held that, without a foundation to tether the statements concerning psychological trauma directly to the medical diagnosis of that specific patient, the doctor's testimony lacked an adequate foundation to admit the statements under Rule 803(4). *Id.*

Here, Nurse Plante's testimony does not indicate how Iliana's statements identifying defendant or how her account of screaming, being pushed, etc., impacted Nurse Plante's performance of the forensic exam. This harkens back to our reasoning in *State v. Gaspar*, wherein we perceived an insufficient foundation because "[t]he doctor did not provide any medical reason as to why she obtained [the complainant's] narrative." *Gaspar*, 982 A.2d at 152. Under the facts of that case, we gleaned that the testimony "suggest[ed] forensics, not medicine." *Id.* Therefore, we concluded that the statements fell outside the bounds of Rule 803(4). *Id.* at 153.

Indeed, this Court readily admits statements under Rule 803(4) where the prosecutor elicits testimony from the state's witness that establishes a clear connection between the statements and the relevant diagnosis. *See, e.g., State v. Moten*, 64 A.3d 1232, 1240 (R.I. 2013) (modeling an "evidentiary foundation laid by the prosecutor [that] tracked the hearsay exception found in Rule 803(4)"). In *State v. Pierce*, 689 A.2d 1030 (R.I. 1997), the doctor testified explicitly that the

timing of the perpetrator's last penetration of the victim was "significant [to her diagnosis] for several reasons[,]" including that "the latest date of penetration would determine how [the doctor] proceeded on the pelvic exam and the timing of some of the laboratory tests." *Pierce*, 689 A.2d at 1033 (brackets, internal quotation marks, and deletions omitted). Likewise, in *State v. Benitez*, 266 A.3d 1221 (R.I. 2022), we recognized that the prosecutor and the trial justice demonstrated "great effort * * * to ensure that [the doctor's] testimony did not go beyond that which is permitted under the medical diagnosis or treatment exception to the hearsay rule * * *." *Benitez*, 266 A.3d at 1228. Thus, we deemed that the statements were handled properly under the rule. *Id.* It does not appear that similar efforts to cabin the testimony were exercised here.

I am unable to conclude that the mere possibility that Iliana would require further "support" from Nurse Plante made the narrative statements about Iliana's assault pertinent to Nurse Plante's "treatment" of her. This connection is uncomfortably tenuous, especially in light of our precedents that call for a more apparent connection between the hearsay statement and the resulting medical diagnosis. *See, e.g.*, *Pierce*, 689 A.2d at 1033; *Gaspar*, 982 A.2d at 152; *Watkins*, 92 A.3d at 188; *Moten*, 64 A.3d at 1240.

For the foregoing reasons, I am of the opinion that the trial justice erred in allowing Nurse Plante to testify about the statements made to her by Iliana under

Rule 803(4).  Because I believe that such error was harmless beyond a reasonable doubt, however, I concur in the judgment.



## STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. James White. |
| **Case Number** | No. 2021-216-C.A. (P1/17-1457A) |
| **Date Opinion Filed** | June 30, 2023 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Netti C. Vogel |
| **Attorney(s) on Appeal** | For State: <br><br> Virginia M. McGinn <br> Department of Attorney General <br> For Defendant: <br><br> Kara J. Maguire <br> Rhode Island Public Defender |